## ETSI PIPELINE PROJECT *v.* MISSOURI ET AL.

No. 86–939.   Argued November 3, 1987—Decided February 23, 1988*

---

*Together with No. 86–941, *Hodel, Secretary of the Interior, et al.* v. *Missouri et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the consideration or decision of the case.

*Jeffrey P. Minear* argued the cause for petitioners in both cases. With him on the brief for petitioners in No. 86–941 were *Solicitor General Fried, Acting Assistant Attorney General Flint, Deputy Solicitor General Wallace, Fred R. Disheroon,* and *Ralph W. Tarr. James A. Hourihan, Walter A. Smith, Jr.,* and *Mary Anne Sullivan* filed briefs for petitioner in No. 86–939.

*Elizabeth M. Osenbaugh,* Deputy Attorney General of Iowa, argued the cause for respondents in both cases. With her on the brief for respondents State of Missouri et al. were *Thomas J. Miller,* Attorney General of Iowa, *Eliza Ovrom,* Assistant Attorney General, *William L. Webster,* Attorney General of Missouri, *Curtis F. Thompson,* Assistant Attorney General, *Robert M. Spire,* Attorney General of Nebraska, and *Le Roy W. Sievers,* Assistant Attorney General. *Stephen E. Roady, Ronald J. Wilson,* and *William E. Walters III* filed a brief for respondents Kansas City Southern Railway Co. et al.†

JUSTICE WHITE delivered the opinion of the Court.

We must decide whether in the circumstances of this case the Secretary of the Interior has exceeded the authority Congress delegated to him by the Flood Control Act of 1944.

I

The dispute centers on Lake Oahe, an enormous reservoir located on the Missouri River in South Dakota, with a capacity of more than 23 million acre-feet of water. In 1982, ETSI

---

†*Roger A. Tellinghuisen,* Attorney General of South Dakota, *Charles J. Meyers, Joseph B. Meyer,* Attorney General of Wyoming, *Michael T. Greely,* Attorney General of Montana, and *Nicholas J. Spaeth,* Attorney General of North Dakota, filed a brief for the State of Montana et al. as *amici curiae* urging reversal.

Pipeline Project entered into a contract with the Secretary of the Interior to withdraw up to 20,000 acre-feet of water from Lake Oahe per year for 40 years.[1]   South Dakota already had granted ETSI a state permit to use this water in a coal slurry pipeline that would transport coal from Wyoming to the southeastern United States.   Soon after the contract was signed, the States of Missouri, Iowa, and Nebraska brought suit in District Court to enjoin performance of the contract, alleging that the manner in which the contract was approved violated several federal statutes.   In particular, the plaintiffs contended that the Interior Secretary lacks statutory authority under the Flood Control Act of 1944 (Act), 58 Stat. 887, to execute a contract to provide water from Lake Oahe for industrial uses without obtaining the approval of the Secretary of the Army.[2]

The District Court ruled for the plaintiffs.   *Missouri* v. *Andrews*, 586 F. Supp. 1268 (Neb. 1984).   It concluded that the Oahe Dam was not a reclamation or power development that was undertaken by the Interior Secretary, pursuant to clear statutory authority.   Instead, the dam was built by the Corps of Engineers, now part of the Department of the Army (formerly the Department of War, but renamed by Act of July 26, 1947, 61 Stat. 495), which has always maintained and operated the reservoir.   No block of water in Lake Oahe has been specifically set aside for use by the Interior Department, and the Interior Secretary has not constructed any works at Lake Oahe.   On these facts, the District Court held

---

[1] Although the contract states that the Interior Secretary entered into it "after consultation with the Secretary of the Army," App. 226, no party has disputed the fact that the Secretary of the Army did not expressly approve or sign the contract, which was signed on behalf of the United States by a regional director for the Interior Department's Bureau of Reclamation.   *Id.*, at 234.

[2] This case also has involved several procedural issues, as well as ancillary issues about the validity of the contract.   Those other issues are not before this Court.   Neither is there any issue presented here as to the relative interests of the United States and South Dakota in Lake Oahe water.

that the Act does not empower the Interior Secretary to furnish water from Lake Oahe for industrial use.

The Court of Appeals affirmed, with one judge dissenting. *Missouri* v. *Andrews*, 787 F. 2d 270 (CA8 1986). It upheld the District Court's conclusion that Lake Oahe is not a reclamation development undertaken by the Interior Secretary, primarily because the Army built the reservoir and controls its operation. Accordingly, the Interior Secretary cannot contract on his own to withdraw water from the reservoir for industrial use. Neither the language nor the legislative history of the Act was thought to support the claim that the Interior Secretary was ceded broad authority over water in this reservoir, even water that it claims has been designated as available for future irrigation purposes. Indeed, the language of the Act and its legislative history were found to be convincing enough on this point that the Court of Appeals refused to defer to the Interior Secretary's contrary interpretation.

The Court of Appeals denied a petition for rehearing en banc by an equally divided vote of the judges. We granted certiorari, 480 U. S. 905 (1987), and we now affirm.

## II

### A

The Missouri River Basin is a watershed that covers a vast area in the midwestern United States. The topography of this area, however, reveals two distinct regions that experience very different water problems. The upper part of the Basin, which includes large sections of Montana, Wyoming, North Dakota, and South Dakota, is mostly arid or semiarid; there, the Missouri River and its tributaries are important because they represent a major resource for developing the agricultural and industrial potential of the area. The lower part of the Basin, which includes territory in Nebraska, Kansas, Iowa, and Missouri, is more humid, and there the rivers are used chiefly for navigation, though the critical problem in

this region is to control flooding. See generally M. Ridgeway, The Missouri Basin's Pick-Sloan Plan 47–55 (1955). In the early 1940's, Congress focused its attention on the water problems of the Missouri River Basin, prompted especially by severe floods that had devastated the lower Basin in 1943 and 1944.

At the behest of Congress, the Army Corps of Engineers prepared a report that described a comprehensive plan to develop the entire Basin, known as the Pick Plan for its author, a colonel in the Corps. The Pick Plan proposed the construction of 12 multiple-purpose reservoirs and related works, including 5 reservoirs on the main stem of the Missouri River, at an approximate initial cost of $480 million, though it was estimated that to carry out the entire proposal might cost close to $1 billion. The Pick Plan stressed flood control as its primary objective, but noted that its comprehensive list of projects "would also provide for the most efficient utilization of the waters of the Missouri River Basin for all purposes, including irrigation, navigation, power, domestic and sanitary purposes, wildlife, and recreation," as well as other intangible benefits. H. R. Doc. No. 475, 78th Cong., 2d Sess., 29 (1944) (H. R. Doc.). The report estimated the gross storage capacity of the Oahe Reservoir at about 6 million acre-feet of water.

At almost the same time, the Interior Department's Bureau of Reclamation independently completed its own plan to develop the Basin, which it had begun earlier, known as the Sloan Plan after the Montana engineer who prepared much of its analysis. The Sloan Plan proposed a total of 90 reservoirs, many of them on the smaller tributary streams, and included 3 reservoirs on the main stem of the Missouri River, at a projected cost of $1.2 billion, with much of that figure to be repayable. The Sloan Plan was also a comprehensive proposal, though it emphasized use of the water for irrigating land, especially in the upper part of the Basin. It estimated that the Oahe Reservoir would hold 19,600,000 acre-feet of

water. The Sloan Plan also contained a section comparing its provisions to those in the Pick Plan and suggesting modifications to the Pick Plan "which appear necessary to satisfy water-use requirements throughout the Missouri River Basin." S. Doc. No. 191, 78th Cong., 2d Sess., 120 (1944) (S. Doc.). This section concluded that though "the capacity of individual reservoirs, as well as aggregate capacities, remain to be determined in greater detail," the "Army and Reclamation plans on storage needs for all purposes can be composed." Id., at 122–123.

The Pick and Sloan Plans differed with one another not only in their primary objectives, but also in several other important respects, such as the amount of expenditures and the number of projects. The engineering features of the two plans also were dissimilar. On the main stem of the Missouri River, the two plans called for different numbers of reservoirs of divergent sizes, and thus for inconsistent amounts of total water storage. Even where the two plans agreed on the need for a particular reservoir at a particular location, which they did at Oahe and at Fort Randall, they envisioned those projects very differently; as noted above, for example, the Sloan Plan proposed that Lake Oahe would hold more than three times as much water as called for in the Pick Plan, at an additional cost of more than $20 million.

Obviously Congress could not proceed with both plans at once. In order to arrive at a single set of projects for development of the Basin, a Committee composed of two representatives each from the Corps of Engineers and the Bureau of Reclamation was appointed to review the engineering features of the two plans. This Committee essentially combined the determinations made by the Corps about the projects that would be needed for flood control and navigation and the determinations made by the Bureau about the additional projects that would be needed for irrigation. After meeting for two days, the Committee produced an engineering report that recommended most of the specific

developments that had been set out in the Sloan Plan, but provided for six main-stem reservoirs on the Missouri River. The Oahe Reservoir was to be created by construction of a high dam and to have a gross storage capacity of 19 million acre-feet of water. The stated purposes of Lake Oahe were to allow "the irrigation of 750,000 acres of land in the James River Basin as well as to provide useful storage for flood control, navigation, the development of hydroelectric power, and other purposes." S. Doc. No. 247, 78th Cong., 2d Sess., 3 (1944). As had been proposed in the Sloan Plan, the irrigation of the James River Basin was to be made possible by construction of a system of long canals, including one canal approximately 125 miles long. See S. Doc., at 115–116. With a single set of projects before it at last, Congress enacted the Flood Control Act of 1944 less than two months later.

## B

In the Act, Congress accomplished three distinct tasks. First, it authorized certain specific projects to be undertaken by approving the "general comprehensive plans set forth in [the Pick and Sloan Plans] as revised and coordinated by Senate Document 247." § 9(a), 58 Stat. 891. It directed that "the initial stages recommended are hereby authorized and shall be prosecuted by the War Department and the Department of the Interior as speedily as may be consistent with budgetary requirements." *Ibid.* Second, Congress appropriated funds to pay for the initial work done on those projects. Two separate allotments were authorized: $200 million "for the partial accomplishment of the works to be undertaken under said expanded plan by the Corps of Engineers," § 9(d), and another $200 million "for the partial accomplishment of the works to be undertaken under said plans by the Secretary of the Interior." § 9(e).

Third, Congress adopted an administrative framework within which these projects were to go forward. This task involved several areas of potential controversy. The Act

evoked federalism concerns because the States were anxious to keep control over the development of their lands and the use of valuable water resources. In response, Congress declared a policy of "recogniz[ing] the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control." § 1, as set forth in 33 U. S. C. § 701–1 (1952 ed.). The Act also implicated the tensions between the Upper Basin States and the Lower Basin States, whose interests in the use and control of the water were markedly different. Congress addressed this problem by providing that when the Department of War undertook additional works not authorized by the Act it would be required to consult and share information with the affected States and the Secretary of the Interior, depending on whether the works were located west of the 97th and 98th meridians. §§ 1(a) and (b). All projects proposed by the Interior Secretary that would involve construction of "works for irrigation" were made subject to a similar requirement, without regard to geographical location. § 1(c).

Finally, and most directly relevant to this case, the Act required Congress to deal with the administrative jurisdictions of several agencies of the Federal Government. Among the interested agencies were not only the Departments of War and Interior, but also the Department of Agriculture and the Federal Power Commission, both of whom joined the Interior Department in submitting comments on the Pick Plan, and both of whose interests were also touched on by the Act. H. R. Doc., at 1–3, 10–13; Act, §§ 2, 5, 11–15, 58 Stat. 889, 890, 903–907. The crucial provisions here, however, were the sections that set forth the specific authority allotted to War and Interior, the two key Departments affected by the Act. In relevant part, those five central sections of the Act state as follows:

(1) "The Chief of Engineers, under the supervision of the Secretary of War, is authorized to construct, maintain, and

operate public park and recreational facilities in reservoir areas under the control of the War Department, and to permit the construction, maintenance, and operation of such facilities. The Secretary of War is authorized to grant leases of lands, including structure or facilities thereon, in reservoir areas for such periods and upon such terms as he shall deem reasonable." § 4, 16 U. S. C. § 460d (1946 ed.).

(2) "Electric power and energy generated at reservoir projects under the control of the War Department and in the opinion of the Secretary of War not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy." § 5, 16 U. S. C. § 825s (1946 ed.).

(3) "That the Secretary of War is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the War Department." § 6, 33 U. S. C. § 708 (1946 ed.).

(4) "Hereafter, it shall be the duty of the Secretary of War to prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds provided on the basis of such purposes, and the operation of any such project shall be in accordance with such regulations." § 7. See 33 U. S. C. § 709 (1946 ed.).

(5) "Hereafter, whenever the Secretary of War determines, upon recommendation by the Secretary of the Interior that any dam or reservoir project operated under the direction of the Secretary of War may be utilized for irrigation purposes, the Secretary of the Interior is authorized to construct, operate, and maintain, under the provisions of [the Federal reclamation laws,] . . . such additional works in connection therewith as he may deem necessary for irrigation purposes. . . . Dams and reservoirs operated under the direction of the Secretary of War may be utilized hereafter for

irrigation purposes only in conformity with the provisions of this section." § 8. See 43 U. S. C. § 390 (1946 ed.).

## III

### A

In light of these specific provisions, as well as the general background to the Act, it is beyond question that the Interior Secretary does not possess the authority that is claimed in this case: to execute a contract to provide water from an Army reservoir for industrial uses without obtaining the approval of the Secretary of the Army. Nobody has disputed that Lake Oahe, one of the six main-stem reservoirs on the Missouri River, was constructed by, and has been operated and maintained by, the Army Secretary, and the District Court found this to be true as a matter of fact. 586 F. Supp., at 1273–1274. The Act says explicitly that such reservoirs are "under the control of" or "under the direction of" the Army Secretary. §§ 4–6, 8. Only two provisions of the Act provide for the Interior Secretary to exercise any authority whatsoever at Army reservoirs, and in both instances the Act clearly states that the Interior Secretary's authority is subordinate to that of the Army Secretary, who does after all "control" those reservoirs. The Interior Secretary is authorized to "transmit and dispose of" electric power and energy generated at Army reservoirs, but only when that energy is "in the opinion of the Secretary of [the Army] not required in the operation of such projects." § 5. The Interior Secretary is also authorized to recommend to the Army Secretary that an Army reservoir "be utilized for irrigation purposes," and to "construct, operate, and maintain . . . such additional works in connection therewith as he may deem necessary for irrigation purposes." § 8. But this authority only comes into play if the Army Secretary "determines" that "any dam or reservoir project operated under [the Secretary's] direction" may be used for such purposes. *Ibid.* The language of the Act is plain in every respect, and the conclu-

sion is unavoidable that if the Interior Secretary wishes to remove water from an Army reservoir for *any* purpose, the approval of the Army Secretary must be secured.

The precise authority claimed by the Interior Secretary in this case is to enter into a contract, without the approval of the Army, to remove from Lake Oahe water that is claimed to be available for irrigation, and to allow that water to be devoted to industrial use. Nowhere does the Act provide any support for this claimed authority, and in fact it is directly inconsistent with §§ 6 and 8 of the Act, which show that only the Army Secretary has that independent authority in this instance. Section 6 gives the Army Secretary the authority "to make contracts with States, municipalities, private concerns, or individuals . . . for domestic and industrial uses for surplus water that may be available at any reservoir" under the Secretary's control, "*Provided,* That no contracts for such water shall adversely affect then existing lawful uses of such water." The language of the Act is plain enough: "surplus water" is all water that can be made available from the reservoir without adversely affecting other lawful uses of the water. As long as ample water remains in Lake Oahe for the purposes embodied in the Act, and absent any allocation for irrigation pursuant to § 8, the Army Secretary has exclusive authority to contract to remove water for industrial uses. In this light, two of the District Court's factual findings take on special significance. First, the District Court found no evidence "which would show that specific storage space in Oahe Reservoir was assigned to irrigation," and "there is no evidence that separate allocations were made at Oahe." 586 F. Supp., at 1277. Second, "there is no evidence that any Oahe water ever has been used for irrigation or will be in the near future." *Id.*, at 1274. In light of these facts, and the plain provisions of § 8, the Interior Secretary had no authority to dispose of Lake Oahe water. The Army Secretary might have but has not done so.[3]

---

[3] At one time, the Army took the view that the only "surplus water" in the main-stem reservoirs was the water that neither was held in the reser-

Section 8 details the procedures for utilizing water from Lake Oahe for irrigation, and only when these procedures are followed does the Interior Secretary have any authority to deal with Lake Oahe water. The Interior Secretary may recommend to the Army Secretary that an Army reservoir be utilized at least in part for irrigation purposes. If the Army Secretary determines that the reservoir may be used for this purpose, then the Interior Secretary "is authorized to construct, operate, and maintain, under the provisions of [the Federal reclamation laws,] . . . such additional works in connection therewith as he may deem necessary for irrigation purposes." Congress must grant "specific authorization" for the construction of any such additional works. Water from Army reservoirs "may be utilized hereafter for irrigation purposes only in conformity with the provisions of this sec-

---

voirs nor was run through the generators to produce hydroelectric power—in other words, that no "surplus water" existed in the reservoirs themselves—apparently because it assumed that all water contained in the reservoirs "is otherwise being used" for specified purposes. Army Memorandum, Marketing of Missouri River Water for Coal Gasification, AR900407 (Dec. 16, 1974), App. 133. More recently, however, the Army has abandoned this assumption and recognized that "this interpretation of what constitutes surplus water is unnecessarily narrow." Memorandum from Susan Crawford, General Counsel of Army, to Assistant Secretary of Army, Proposed Contracts for Municipal and Industrial Water Withdrawals from Main Stem Missouri Reservoirs 2 (March 13, 1986), App. to Brief for Respondent States 14a. Its current position is that § 6 of the Act gives the Army Secretary the same authority over "water he determines is not needed to fulfill a project purpose in Army reservoirs" that the Interior Department possesses over water contained in its own reservoir projects, namely, the authority to withdraw water for industrial use if to do so would not impair the efficiency of the project for its other stated purposes. Memorandum of Crawford 4, App. to Brief for Respondent 16a. See also Army Circular EC 1105–2–181, pp. 3–4 (Oct. 30, 1987). This view is consistent with the language of the Act, for if the term "surplus water" could never include any of the water stored in the reservoirs themselves, then the caveat Congress enacted in § 6—that this grant of authority shall not "adversely affect then existing lawful uses of such water"—would have been irrelevant because this grant of authority could never adversely affect any existing or projected uses of such water.

tion." § 8. It may be recalled at this point that the Sloan Plan, which had envisioned the use of a substantial amount of water from Lake Oahe for irrigation of the James River Basin, was consistent with this approach; the Sloan Plan provided for the construction of massive additional works for irrigation comprising a system of long canals. S. Doc., at 115–116. By this means, Interior would be permitted to withdraw water from Army reservoirs through these additional works for use in irrigation, which would then bring that water under its control, and under the federal reclamation laws the Interior Secretary may reallocate irrigation water from irrigation projects to other purposes when he sees fit, as long as "it will not impair the efficiency of the project for irrigation purposes." 43 U. S. C. § 485h(c) (1946 ed.).[4] In this case, the District Court found that the Interior Department did begin initial construction on irrigation works at Lake Oahe, but Congress later authorized the Department to cancel construction, which it did. 586 F. Supp., at 1274. As already stated, the District Court found that no water from Lake Oahe has ever been used for irrigation, *ibid.*, and we are unaware of any such plans in the near future. Under these circumstances, the Interior Secretary is not "in conformity with the provisions of" § 8, and therefore has no authority under the Act to withdraw water from Lake Oahe, whether for irrigation or otherwise. It is likely that

---

[4] See also 43 U. S. C. § 521 (1946 ed.). Under that section the Interior Secretary "in connection with the operations under the reclamation law is hereby authorized to enter into contract to supply water from any project irrigation system for other purposes than irrigation . . . : *Provided* . . . , That no water shall be furnished for the uses aforesaid if the delivery of such water shall be detrimental to the water service for such irrigation project." The Interior Secretary's determination that the sale of water does not impair the irrigation purpose of a project under his control has been accorded broad deference. See, *e. g., Environmental Defense Fund* v. *Morton,* 420 F. Supp. 1037 (Mont. 1976), aff'd in part and rev'd in part, *Environmental Defense Fund* v. *Andrus,* 596 F. 2d 848 (CA9 1979).

Lake Oahe contains surplus water, but that water is subject to disposal by the Army, not by Interior.[5]

## B

The petitioners seek to avert this conclusion by pointing to §§ 9(a) and (c) of the Act. Section 9(a) approves the "general comprehensive plans" set out in the Pick Plan and the Sloan Plan, as revised and coordinated by the final Senate Document, and authorizes the initial stages of those projects to be "prosecuted by the War Department and the Department of the Interior as speedily as may be consistent with budgetary requirements." The petitioners contend that this statement represents congressional approval of various aspects of the functional division of authority between the Army and Interior Departments that had been suggested in those plans; in particular, the petitioners suggest that this provision allows the Interior Secretary unilaterally to remove water from Army reservoirs for irrigation purposes and for other related uses.

This contention is both wide of the mark and grounded on a misuse of the legislative history. To begin with, it would be surprising if Congress had followed up the five sections of the Act in which it explicitly established the jurisdiction of Army and Interior over specific uses of Army reservoirs, the last section of which established jurisdiction over the use of those reservoirs for irrigation, with a provision in which it indi-

---

[5] Nothing in today's decision, it should be emphasized, prevents the water in Lake Oahe from being put to beneficial use for industrial or other purposes. Of the 23 million acre-feet of water stored in this reservoir, by far the most part was projected for potential use in irrigation. As the District Court found, however, none of this water has been allotted for irrigation, no works have been constructed to make use of this water for irrigation, and none of this water has ever been used for irrigation or is likely to be used for that purpose in the foreseeable future. 586 F. Supp., at 1274, 1277. On these facts, there is considerable leeway for the Army Secretary to designate some of this water for industrial use without "adversely affect-[ing]" the "existing lawful uses of such water." Act, § 6. Certainly if the Executive Branch as a whole wishes to put the water in this reservoir to beneficial use, it may do so simply by complying with the terms of the Act.

rectly made further refinements in how water could be used for irrigation, and yet did not offer the slightest indication that it was doing so. In any event, there is no reason to think that § 9(a) incorporates into the Act any additional indications about the proper division of authority between Army and Interior. On the contrary, its location in § 9 of the Act indicates that this provision was not intended as anything more than authorization for the two Departments to begin working on the projects listed in the final Senate Document. The other parts of § 9 merely harmonize the Act with existing laws and set out separate appropriations for Army and Interior to begin "the partial accomplishment of the works to be undertaken under said expanded plans," §§ 9(d) and (e), which indicates that this entire section of the Act encompasses only the necessary ministerial details to allow action to begin on the specified projects.

If there were any room for believing that § 9(a) implicitly modified the jurisdictional provisions that were plainly set forth in the preceding sections of the Act, or for doubting that it instead approved a different division of authority from that suggested in the Pick Plan and the Sloan Plan, one item in the legislative history puts this supposition entirely to rest. The original House version of the Act included language almost identical to the suggestions made in the two plans, see *infra*, at 511–512, which obliged the Interior Secretary "to prescribe regulations" for the use of water stored in Army reservoirs for irrigation. Hearings on H. R. 4485 before a Subcommittee of the Senate Committee on Commerce, 78th Cong., 2d Sess., 2 (1944). Secretary Ickes testified at the Senate Hearings on the proposed bill that this approach did not relate very well to the reclamation laws because it "disregards the problem of allocating costs for multiple-purpose facilities serving other uses in addition to irrigation." *Id.*, at 458. He proposed replacing that approach instead with the language currently contained in § 8 of the Act, which was eventually enacted by Congress. *Id.*, at 313. As noted

above, § 8 now provides that Army controls the main-stem reservoir projects and Interior controls all such additional irrigation works as it may "construct, operate, and maintain" at the site of those main-stem projects. One need not draw all the inferences that may be justified by this piece of legislative history in order to make it decisive here, for at the very least it directly refutes the notion that the other sections of the Act were intended to effect no changes in the division of authority between Army and Interior that had been suggested in the Pick Plan and the Sloan Plan.

Moreover, even if § 9(a) had been intended to adopt every aspect of the functional division of authority between the two Departments that had been proposed in the Pick and Sloan Plans, this section would not provide Interior with the authority to withdraw water unilaterally from Lake Oahe for irrigation and other uses in flat contradiction of § 8 of the Act. Contrary to the petitioners' argument in this case, nothing in those two plans indicates that control over individual reservoirs was to be divided among various departments of the Federal Government. The Pick Plan, for example, emphasized that although the Department of War was willing to coordinate its activities with Interior in order to serve "the broad and important interests and responsibilities" of both agencies, "[i]t is essential, however, that the main-stem projects be built, operated, and maintained by the Corps of Engineers." H. R. Doc., at 3–4. The War Department noted that although it would retain control of those reservoir projects, it accepted that "utilization of storage reserved for irrigation" in those reservoirs "should be in accordance with [Interior] regulations." Id., at 4.[6] But this accession is not

---

[6] In its comments on the Pick Plan, Interior endorsed this approach, stating that the Army "Corps of Engineers should construct, operate, and maintain any feature in which flood control and navigation are dominant considerations, and the [Interior's] Bureau of Reclamation should construct, operate, and maintain any feature in which the functions of irrigation, restoration of surface and ground water levels, and power are domi-

at all the same as dividing control between the two agencies over the reservoir projects or the water stored in those projects, which was not contemplated in the Pick Plan. The Sloan Plan basically agreed with the approach set out in the Pick Plan, recognizing that the agency "with primary interest in the dominant function of any feature proposed in the plan should construct and operate that feature, giving full recognition, in the design, construction, and operation, to the needs of other agencies with minor interests." S. Doc., at 11. The Sloan Plan recognized that the "dominant function" of Lake Oahe and the other main-stem reservoir projects would be flood control and navigation, and therefore these projects would come under the jurisdiction of the Army and its Corps of Engineers. *Id.*, at 4.[7] Even if Congress had intended to write the jurisdictional structure suggested in the Pick Plan and the Sloan Plan directly into law, therefore, it would not have extended to Interior the unilateral authority that has been claimed in this case.

The petitioners also point to § 9(c) of the Act as lending support to its argument. That section states that "the reclamation and power developments to be undertaken by the

---

nant," though the two Departments would "advise and consult with" one another to the extent that these interests overlapped in features controlled by one or the other Department. H. R. Doc., at 7.

[7] The self-styled "joint engineering report" contained in the final Senate Document that effected a reconciliation of the Pick and Sloan Plans did not shed any further light on how the administrative jurisdictions of the two Departments were to be circumscribed, but merely observed that the engineering features of the two plans were brought into agreement by applying the principles that the Army Corps of Engineers "should have the responsibility for determining main stem reservoir capacities and capacities of tributary reservoirs for flood control and navigation," and the Bureau of Reclamation "should have the responsibility for determining the reservoir capacities on the main stem and tributaries of the Missouri River for irrigation." S. Doc. No. 247, 78th Cong., 2d Sess., 1 (1944). This passage seems to be nothing more than an explanation of how the final number of projects and the amount of their storage capacities were reached by the representatives of the two Departments.

Secretary of the Interior under said plans shall be governed by the Federal Reclamation Laws." As noted already, under the reclamation laws the Interior Secretary is authorized to reallocate water under his control for industrial use as he sees fit. See n. 4, *supra*. By its terms, however, § 9(c) applies only to "the reclamation and power developments" undertaken by the Interior Secretary under the Act: that is, to the "transmission lines and related facilities" that § 5 authorizes the Interior Secretary "to construct or acquire" for transmitting and disposing of electric power, and to the "irrigation works" that § 8 authorizes the Interior Secretary "to construct, operate, and maintain" under the reclamation laws. This provision merely stipulates that the reclamation laws, which typically apply to other Interior projects, see 43 U. S. C. § 371 *et seq.* (1946 ed.), also apply to all the projects that Interior may undertake under the Flood Control Act. But as the District Court found, and as is readily apparent, the reservoir project engineered by the Army at Oahe is neither a "power development" nor a "reclamation development" that has been undertaken by the Interior Secretary. 586 F. Supp., at 1273–1278.[8] On the facts of this case, § 9(c)

---

[8] The petitioners contend that the term "reclamation . . . developmen[t]" in § 9(c) can encompass either the entire reservoir project at Oahe or the activities that Interior might undertake to dispose of water stored at Oahe for irrigation. Neither suggestion is tenable. The construction of the main-stem dam and reservoir project at Oahe was undertaken and controlled by the Army, and the District Court found this to be true as a matter of fact; thus Oahe cannot be a "reclamation . . . developmen[t] to be undertaken by the Secretary of the Interior." And the suggestion that the term "reclamation . . . developmen[t]" may refer to activities rather than projects is wrong for several reasons. First, the whole term is "reclamation and power developments to be undertaken by the Secretary of the Interior." These developments, which were set out more specifically in the Pick and Sloan Plans, plainly refer to the only developments that the Act identifies Interior as undertaking: the "power developments" ("transmission lines and related facilities") identified in § 5, and the "reclamation developments" ("irrigation works") identified in § 8. Second, the term "reclamation . . . developmen[t]" used in § 9(c) of the Act is linked by peti-

clearly does not extend any authority to Interior to withdraw water from Lake Oahe by other means than those stated in the Act.[9]

Not only do the language, structure, and legislative history of the Act fail to support the petitioners in this case, but the substance of their position is also difficult to fathom. The

tioners to § 9(c) of the Reclamation Project Act of 1939, 53 Stat. 1193, as set forth in 43 U. S. C. § 485h(c) (1946 ed.), which is said to give Interior the authority to contract to dispose of this water, yet that statutory section itself limits Interior's authority by stating that such authority may not be used to "impair the efficiency *of the project* for irrigation purposes." *Ibid.* (emphasis added). Thus this same account relates the terms "development" and "project." Third, the integral nature of the relation between these two terms is shown by further consideration of the Reclamation Project Act § 2(*i*), 43 U. S. C. § 485a(*i*) (1946 ed.), which defines the term "development unit" as "a part of a project which, for purposes of orderly engineering or reclamation development, is designated as a development unit by order of the Secretary." Thus a "reclamation development" is a designated part of a "reclamation project" under the Reclamation Project Act, for administrative purposes, and the two terms are used almost synonomously in that Act. See § 485f(b).

[9] Petitioners suggest that their reading of the Act is supported by Congress' enactment of § 212 of the Reclamation Reform Act of 1982, 43 U. S. C. § 390*ll*. That provision, however, works no change in any of the substantive provisions of the Flood Control Act, and specifically does not purport to modify § 8 of the Act, which states the manner in which water may be withdrawn from Lake Oahe for use in irrigation. Section 212(a) merely was intended "to eliminate the shadow of applicability of the reclamation law to Corps of Engineers projects in any case in which the intent of Congress concerning such applicability is not clearly and explicitly set forth in statutory language," S. Rep. No. 97–373, p. 16 (1982), which it was not in § 8 of the Act. Section 212(b) simply ensures that the Interior Secretary's "authority to contract with water user entities for the irrigation water deliveries from Corps of Engineers projects, and to collect appropriate charges for those deliveries, continues in effect." *Ibid.* It says nothing about when and how the Interior Secretary possesses and exercises the authority to enter into such contracts, which is prescribed in § 8 of the Act. Even more to the point, § 212 does not indicate in any way that the Interior Secretary has the authority to enter into a contract to withdraw water from an Army reservoir for industrial use, which is the precise authority asserted in this case.

petitioners claim that the administrative structure established in the Act divides authority over Lake Oahe between Army and Interior in a novel fashion that is considerably different from what appears on the face of the Act. One possibility, which the petitioners disavow, is that Interior has the ultimate authority to use water from the reservoir for irrigation purposes and Army has the ultimate authority to use water from the reservoir for flood control and navigational purposes. This approach obviously would founder, and could give rise to endless squabbles, unless the water in the reservoir has been allocated between these uses, yet the District Court explicitly found "no evidence that separate allocations were made at Oahe," and "one wonders how the Interior Department is to control what cannot be identified." 586 F. Supp., at 1277. The position actually urged by the petitioners is even less straightforward than the foregoing: they argue that the Act *requires* Interior *to consult with* Army before withdrawing any water for industrial use from Lake Oahe, and *does not allow* Interior to withdraw water *if Army objects*, and yet the Act *does not require* Interior *to obtain the approval* of Army in order to withdraw water for industrial use. Tr. of Oral Arg. 14–15. The Army's authority over Lake Oahe is thus to be understood as most closely analogous to an executive veto over legislation: Interior must offer its proposal to the Army, and cannot proceed on its own if the Army objects, but can proceed even without Army approval as long as Army does not object. This would be, to say the least, a most unusual approach to administrative jurisdiction, one that gains no support from the text of the Act, and one that we are unwilling to read into the Act as an implicit modification of its otherwise sensible and intelligible provisions.

## C

The petitioners finally contend that this Court should defer to the Interior Secretary's interpretation of the authority granted to him under the Act, which the Army apparently

has acquiesced in at least for the purposes of this litigation. The petitioners also point to what they describe as a tradition of cooperation between these two Departments in the Missouri River Basin, including a period between 1975 and 1978 when they entered into a joint agreement that allowed the Interior Secretary, "both on his own behalf and as agent for the Secretary of the Army, [to] contract for the marketing of water for industrial uses" from the six main-stem reservoirs.[10] The District Court disagreed with this historical account of the relations between Interior and the Army on this subject, and concluded that when "the chief attorneys for the two departments affected by a statute disagree, neither enjoys any deference." 586 F. Supp., at 1280. The Court of Appeals discussed this issue very briefly, but the gist of its holding was simply that Interior's interpretation did not even constitute a reasonable reading of the Act. 787 F. 2d, at 287.[11]

It is unnecessary to consider the petitioners' contention that deference to the Interior Secretary is appropriate in this case and their related arguments about the history of relations between Army and Interior under the Act, for even if Interior's interpretation of the Act would be entitled to any

---

[10] This "Memorandum of Understanding" declared that the Army Secretary "shall retain all operational and managerial control over said reservoirs." Memorandum of Understanding Between Secretary of Interior and Secretary of Army, AR900072 (Feb. 24, 1975), App. 136. Over the four years it was in effect, no contracts were executed under it, and the agreement was allowed to expire in 1978. It also appears, by all accounts, that the contract at issue in this case is the only instance of the Interior Secretary exercising unilateral authority to withdraw water for industrial uses from a reservoir project controlled by the Army.

[11] Both the District Court and the Court of Appeals mentioned various reasons why the Interior Secretary's interpretation of the Act might not be entitled to deference even if it were a reasonable interpretation. But since in the end the District Court, like the Court of Appeals, concluded that the agency's decision was not "reasonable," 586 F. Supp., at 1280, its additional comments, like those of the Court of Appeals, were pure dictum, and there is no reason to address them here.

deference in these circumstances, the Executive Branch is not permitted to administer the Act in a manner that is inconsistent with the administrative structure that Congress enacted into law. As this Court has stated in a recent opinion on the proper limits of deference to an agency's construction of the statute which it administers: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). The Flood Control Act speaks directly to the dispute in this case, and congressional intent as expressed in the Act indicates clearly that the Interior Secretary may not enter into a contract to withdraw water from an Army reservoir for industrial use without the approval of the Department of the Army. That is "the end of the matter." *Id.*, at 842.

The decision of the Court of Appeals is therefore affirmed.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.