**UNITED STATES of America, Plaintiff,**

v.

**13.10 ACRES OF LAND SITUATED IN the COUNTY OF PUTNAM, STATE OF NEW YORK; Christina Mattin; Tax Collector, Town of Putnam Valley; Unknown Heirs of Philip Philipse and Unknown Others, Defendants.**

**No. 85 Civ. 2496 (CSH).**

United States District Court, S.D. New York.

March 8, 1990.

Bernard W. Bell, Asst. U.S. Atty., S.D. N.Y., New York City, for plaintiff.

James G. Glazebrook, Jacob, Medinger & Finnegan, New York City, for Christina Mattin.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is now before the Court on defendant Mattin's motion for summary judgment and plaintiff's cross-motion for summary judgment pursuant to Fed.R. Civ.P. 56.

### Background

Factual Background

This is a condemnation action by the United States to acquire 13.1 acres of land, which are part of a 95.8 acre parcel in Putnam County owned by Christina Mattin. The Mattin property is a wooded piece of land with a stream running through it. The United States seeks to obtain the Mattin land for inclusion as part of the Appalachian National Scenic Trail,[1] which it has moved from its original location to a new route which runs roughly parallel to the eastern border of Mattin's land. The new trail route does not cross Mattin's land. Rather, the United States seeks to annex the 13.1 acres for the purpose of creating a buffer zone between the actual trail and surrounding areas, which are subject to development to the extent they are privately owned.

The Appalachian trail was developed as a result of the combined efforts of various private hiking clubs, and state and federal agencies. In the late 1930's the trail's existence was more formally established through the signing of agreements by the Appalachian Trail Conference, a private, non-profit confederation of 31 trail clubs;

---

1. The Appalachian Trail is a footpath for use by hikers which extends from Mount Katahdin in Maine to Springer Mountain in Georgia. The trail runs through 14 states and extends approximately 2,100 miles. In those areas where the trail runs through federal lands, such as national parks and forests, lands have been dedicated to the trail. In other areas private landowners have allowed the trail to pass through their land.

each state through which the trail passed; the National Park Service ("Park Service") and the National Forest Service ("Forest Service").

Statutory Framework

The trail existed for several decades unregulated and unprotected until Congress passed the National Trails System Act ("Trails Act"), Pub.L. No. 90–543, 82 Stat. 919 (1968), codified as amended at 16 U.S.C. §§ 1241–1251. The Trails Act vests primary responsibility for administering and protecting the trail with the Secretary of the Interior (the "Secretary"). 16 U.S.C. § 1244(a)(1). The overall goal of the Trails Act is "to provide for the ever-increasing outdoor recreation needs of an expanding population ... in order to promote the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, outdoor areas and historic resources of the Nation." 16 U.S.C. § 1241(a). The Trails Act provides for the creation of three basic types of trails: national recreation trails, national scenic trails, and national historic trails. 16 U.S.C. § 1242. The Appalachian Trail is designated as a National Scenic Trail. 16 U.S.C. § 1244(a)(1).

16 U.S.C. § 1244(a)(1) provides that "[i]nsofar as practicable, the right-of-way for [the Appalachian Trail] shall comprise the trail depicted on the maps identified as 'Nationwide System of Trails, Proposed Appalachian Trail, NST–AT–101–May 1967', which shall be on file and available for public inspection in the office of the Director of the National Park Service." [2] The

trail right-of-way, or more simply the path of the trail, can be changed pursuant to 16 U.S.C. § 1246(b). [3] Congress gave the Secretary the power to acquire lands "[w]here the lands included in a national scenic or national historic trail right-of-way are outside of the exterior boundaries of federally administered areas", 16 U.S.C. § 1246(e), by voluntary sales, id.; other agreements, 16 U.S.C. § 1246(f); or condemnation, 16 U.S.C. § 1246(g). In the 1968 law, Congress limited the Secretary to acquiring 25 acres of land in any one mile of trail. Id.

The House Committee on Interior and Insular Affairs held hearings in 1976, the "Oversight Hearings", 94th Cong., 2d Sess. (1976), which led to the amendment of the Trails Act. See National Trails Act Amendments of 1978, Pub.L. 95–248, 92 Stat. 159. The 1978 amendments included an increase in the amount of land the Secretary was authorized to acquire to 125 acres per mile of trail. 16 U.S.C. 1246(g). Moreover, Congress increased the budget for such acquisitions from $5,000,000 to $95,000,000. 16 U.S.C. § 1649(a)(1).

After the Oversight Hearings, the relevant committees in both the House of Representatives and the Senate noted problems with the protection of the trail. The House Report said the following:

> At the time of the enactment of the National Trails System Act in 1968, Congress recognized the unique recreational opportunities afforded by extended trails of this type. It was also recognized that changing land uses and increase in pres-

---

**2.** In 1971, the Secretary set forth the right-of-way of the trail through the publication of maps of the relevant region over which were superimposed eight hundred and twelve "right-of-way panels." 36 Fed.Reg. 19802–19893 (Oct. 8, 1971).

In other words, the Park Service took aerial photographs of the areas through which the Trail was to pass. Declaration of Charles R. Rinaldi dated April 18, 1988 at ¶ 9 ("Rinaldi Declaration"). Each photograph in the Putnam County area covers approximately four square miles. Id. The photographs, or right-of-way panels, were then superimposed onto maps of the area. The path of the trail corridor is designated with a heavy dotted line.

**3.** 16 U.S.C. § 1246(b) provides as follows:

After publication of notice of the availability of appropriate maps or descriptions in the Federal Register, the Secretary charged with the administration of a national scenic or national historic trail may relocate segments of a national scenic or national historic trail right-of-way, with the concurrence of the head of the Federal agency having jurisdiction over the lands involved, upon a determination that: (i) such a relocation is necessary to preserve the purposes for which the trail was established, or (ii) relocation is necessary to promote a sound land management program in accordance with established multiple-use principles: Provided, That a substantial relocation of the rights-of-way for such trail shall be by Act of Congress.

sures for development were a growing threat to maintaining a continuous trail route. The act therefore provided for a Federal responsibility to protect the trail, including the authority to acquire a permanent right-of-way.

Since the passage of the original act, several steps have been taken to further protect the trail. The U.S. Forest Service has pursued a program of land acquisition to secure the trail route within the national forests. Several states have taken the initiative to acquire a corridor for the trail, frequently making use of matching grants from the land and water conservation fund.

Unfortunately, these measures alone have not been enough to protect the trial. Over 600 miles of the trail remain in private hands and changes in ownership and increasing pressures for development pose threats to the continuity of the trail in numerous instances. Almost 200 additional miles of the trail are now located along roads, providing no real hiking experience, but only a link between disconnected segments of the trail. Some of these miles of road designation are the result of the trail having been forced off of an area of land due to a change in use or ownership.

The Department of the Interior has recognized this increasing threat to the trail, and is preparing a detailed acquisition plan to carry out the mandate of the 1968 act to protect the trail. Experience with the trail has demonstrated, however, that *additional authority is needed to insure the acquisition of a corridor wide enough to protect trail values, and an increase in the funding authorized for the trail will be required to purchase a sufficient route through the areas which are now unprotected.*
H.R.Rep. No. 734, 95th Cong., 1st Sess. 3–4 (1977) (emphasis added) ("House Report"). The report of the Senate echoes these concerns. S.Rep. No. 636, 95th Cong., 1st Sess. 3–4 (1978) ("Senate Report"), U.S. Code Cong. & Admin. News 1978, pp. 456, 457, 458.

Pursuant to the 1978 amendments to the Trails Act, the Secretary and the Appala-chian Trail Conference are required to submit yearly progress reports to the Senate Committee on Energy and Natural Resources and the House Committee on Interior and Insular Affairs regarding progress made in land acquisition. 16 U.S.C. § 1249(a)(2). Since that time the Secretary has submitted the required annual reports.

### Discussion

Defendant Mattin moves for summary judgment on the first of her five affirmative defenses in this action, namely that there has been a "substantial relocation" of the trail absent an act of Congress as is required pursuant to 16 U.S.C. § 1246(b). Plaintiff cross-moves for summary judgment on that first affirmative defense and moves to dismiss each of Mattin's four other affirmative defenses. I address each in turn.

1. Substantial Relocation

■ Defendant Mattin contends that the rerouting of the trail in Putnam County is a substantial relocation requiring an act of Congress. It is common ground that there has been no congressional act on the subject of relocating the trail in Putnam County and if one is required under the Trails Act, the relocation is improper and condemnation of Mattin's land unauthorized. The question is one of statutory construction and therefore one for the Court. *E.g., Stissi v. Interstate and Ocean Transp. Co.,* 765 F.2d 370, 374 (2d Cir.1985) ("[w]hen a decision turns on the meaning of words in a statute or regulation, the decision is one of law which must be made by the court") (citations omitted).

At this point, additional factual background is required. As of 1978, the time of the amendments to the Trails Act, the trail entered Putnam County as it crossed the Hudson River near the United States Military Academy at West Point. The trail ran through the county and into Clarence Fahnestock State Park from which it exited the county. As of 1978, there were approximately 10.75 miles of trail between the Hudson River and Fahnestock State Park,

over 6.5 miles of which was located along roads.

At some unspecified point, the Park Service decided that it was necessary to move the trail in Putnam County and acquire certain surrounding lands in order to carry out the mandate of the Trails Act and the subsequent amendments in respect of protecting the trail. The original plan was to move the trail such that approximately 8.85 miles of trail would run through the county, less than a mile of which would be located along the road. In order to effectuate the plan, approximately 1,050 acres of land owned by fourteen landowners would be affected. Twenty-two of the twenty-five tracts of land necessary to accomplish the rerouting had been acquired by the Park Service as of 1984. In total, 693 acres had been acquired at a cost of $621,-800 with the estimate being that another $61,700 would be required to protect the remaining acres.

In 1984, after the initial acquisitions toward the rerouting in Putnam County had been achieved, the Park Service conducted a "corridor review." The corridor review was done in order to evaluate the adequacy of the protection of the trail and to identify any encroachments upon it. The review entailed the walking of the trail by members of the Park Service.

After the 1984 corridor review, the Park Service expanded its plan to reroute the trail in Putnam County. The acquisitions required to achieve the rerouting increased to thirty-three tracts totalling 938 acres of land. The cost of these acquisitions was budgeted at a total of 2.5 million dollars. The relocated trail is 10 miles in length and the lateral displacement from the original trail, that in existence before any rerouting, is no more than three-quarters of a mile. Mattin contends that this move of the trail constitutes a substantial relocation thereby requiring an act of Congress.

The statute does not define either of the words at issue in this case: "substantial" and "relocation."

The United States takes the position that any rerouting falling within the published right-of-way panels, as this one does, is not a relocation at all and therefore never requires an act of Congress. I do not think this a fair reading of the statutory scheme which makes no reference to the panels. The right-of-way panels were created by an arbitrary aerial mapping scheme. A commonsense definition of the term "relocation", a term not otherwise defined by the statute is clearly any movement or rerouting of the trail. Thus, the question is not whether the trail has been relocated, which it has, but whether that relocation is substantial, which the United States argues it is not.

The question is thus a narrow one—what is the proper construction of the term "substantial" in the context of the statutory scheme at issue here. Mattin argues that the "following factors must be considered in determining the substantiality of a Trail relocation: the length and lateral displacement of the relocated segment, the length of the segment relative to other lengths of Trail, the effect of the relocation on private landowners, the number of acres of land affected, the cost of making the relocation, the expenditures relative to appropriations, and the time required for land acquisition compared with the time allowed by Congress." Mattin Memorandum of Law at 6–7. Mattin proceeds to evaluate the trail relocation according to these self-styled criteria and concludes that the relocation is substantial.

It is hornbook law that the interpretation of a statutory provision by the agency charged with administering the statute is entitled to great deference.

In reviewing an agency's interpretation of the statute which it administers, the court must determine whether Congress has "directly addressed the precise question at issue...." *See Chevron U.S.A. Inc.*, 467 U.S. [837] at 843, 104 S.Ct. [2778] at 2782[, 81 L.Ed.2d 694]. If Congress has addressed the issue, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's

answer is based on a permissible construction of the statute." *Id.* The cases teach that an agency's interpretation of a statute need not be the only reasonable one, or even the one the court would have adopted if the question had initially arisen in a judicial proceeding. *See id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11; *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Indeed, for the agency interpretation to be accepted, it need only be shown that it is "sufficiently reasonable." *See Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. at 39, 102 S.Ct. at 46.

*Weeks v. Quinlan*, 838 F.2d 41, 44 (2d Cir.1988).

In the case at bar, the Secretary has a long-standing interpretation of what is not a substantial relocation within the meaning of the statute. Specifically, the Secretary has stated that relocations of the Trail within the range of a few hundred feet to ten to fifteen miles in length with a lateral displacement of up to a mile are not substantial relocations. 1979 Annual Report for Congress at 3 (Attached as Exhibit C to Rinaldi Declaration). Thus, since 1979, Congress has been aware of the Secretary's interpretation of what is not a substantial relocation and has expressed no dissatisfaction with the Secretary on the point.

The Secretary's interpretation is entitled to great deference unless it is manifestly inconsistent with congressional intent,

which it is clearly not.[4] Congress intended the Secretary to take those steps necessary to ensure that the trail would exist in suitable environs wherever possible, namely not alongside a road or directly adjacent to a developed area. That intent was to be effectuated through increased allocations toward acquisition of the necessary lands and an increase in the acreage that could be acquired per mile of trail. Congress clearly intended that a suitable corridor for the trail be created and maintained, which is exactly what the Secretary seeks to do in this instance. Because the Secretary's interpretation is clearly based on a " 'permissible construction of the statute,' " and is " 'sufficiently reasonable' " *Weeks*, 838 F.2d at 44 (citations omitted), I accept the interpretation of the Secretary and hold that the relocation involved in this case is not substantial and therefore does not require an act of Congress.[5]

### 2. Necessity of Mattin Acquisition

Mattin next argues that 16 U.S.C. § 1246(g) prohibits this acquisition. That section provides in pertinent part:

The appropriate Secretary may utilize condemnation proceedings without the consent of the owner to acquire private lands or interest therein pursuant to this section only in cases where, in his judgment, all reasonable efforts to acquire such lands or interest therein by negotiation have failed, and in such cases *he shall acquire only such title as, in his judgment, is reasonably necessary to provide passage across such lands....*

**4.** Defendant cites *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988) as a case which "affirmed a decision which gave no deference to the Secretary of the Interior's interpretation of the scope of his own statutory power." Letter of James G. Glazenbrook dated June 2, 1988. That case involved the proper interpretation of certain provisions of the Flood Control Act of 1944 and the Court's holding was quite simply that the Secretary's interpretation was flatly contrary to the expressed intent of Congress in respect of the point at issue. Having found that Congress had spoken on the precise matter at issue, the Court held that "[t]hat is 'the end of the matter.' " *Id.* at 495, 108 S.Ct. at 805 (citation omitted).

The instant case presents a different situation from that before the Court in *ETSI*. Congress

has not spoken on the precise point at issue in this case, so the question is not whether the Secretary's interpretation is contrary to congressional intent, but whether it is consistent with a permissible construction of the statute. *Weeks*, 838 F.2d at 44.

**5.** I note that in so holding I am in accord with the only other court that has been faced with this issue. On similar facts, and identical arguments, Judge Cabranes held that the relocation of "11 miles of the trail's total 2,000 miles and acquisition of 18 tracts of land" was not substantial within the meaning of the statute. *United States v. Certain Acres of Land in N.W. Conn.*, No. 84–1229, slip op. at 8 (D.Conn. Oct. 7, 1987).

(emphasis added).

Mattin contends that the United States' plan to acquire her land is not "reasonably necessary."

Mattin's defense is this regard is two-fold; namely that because the trail itself does not cross her land, acquisition of her land is improper and secondly that the decision to condemn her land was made in an arbitrary and capricious manner.

 The first part of Mattin's argument is without merit. A proper construction of the statute clearly supports the Secretary's authority to acquire lands not only for the very narrow foot path that makes up the Appalachian Trail but also lands surrounding the path. House Report at 3–4; Senate Report at 4, U.S.Code Cong. & Admin. News 1978, p. 458 ("additional authority is needed to insure the acquisition of a corridor wide enough to protect trail values"). The committee reports of both houses of Congress clearly express Congress' intent that the Secretary acquire land for a corridor surrounding the trail in order to provide its users with a "real hiking experience." House Report at 3; Senate Report at 3, U.S. Code Cong. & Admin. News 1978, p. 457. Congress' grant of power to the Secretary to acquire 125 acres of land as a corridor per mile of trail, 16 U.S.C. § 1246(g), an average corridor of 1,000 feet further supports this construction. I therefore grant judgment for the plaintiff on Mattin's third affirmative defense.

 I turn now to the second prong of Mattin's defense, namely that the Secretary's decision to condemn the land at issue was arbitrary and capricious and therefore that summary judgment dismissing the defense is inappropriate. This forms the basis of Mattin's opposition to the plaintiff's motion for summary judgment on her second affirmative defense.

As a preliminary matter, I observe that Mattin has not pointed to a single case in which the Second Circuit or the Supreme Court has held that a landowner can block a condemnation action brought by the United States on the grounds that an acquisition decision otherwise authorized by Congress was made in an arbitrary and capricious manner. Even assuming that the arbitrary and capricious standard applies in the instant case, that question involves a legal analysis not appropriate for the finder of fact. The underlying facts are not in dispute and on those facts I think it clear that the Secretary's decision was not made in an arbitrary or capricious manner.

Mattin makes four arguments on this point. I address them in turn. First, Mattin contends that the size of the parcel to be condemned was determined by a "voluntary hiker" rather than a government official, which in her view gives rise to the conclusion that the Secretary's determination was not well taken. However, the factual record does not support Mattin's assertion. In determining what land should be acquired for protecting the trail the Secretary turned to volunteers, a practice long recognized and sanctioned by Congress.[6] In this particular instance one Walt Daniels, a member of the New York/New Jersey Trail Conference, inspected the property and made the recom-

---

**6.** The House Report says the following of volunteer efforts:

> The role of the volunteer in the Appalachian Trail must be continued and enhanced. For 50 years, the dedicated efforts of a great many individuals have made the trail viable. The committee intends that the future administration of the trail will continue to emphasize this partnership. The encouragement of the role of the volunteer in promoting, protecting, and maintaining the Appalachian Trail is sound public policy.

House Report at 5.

> The Senate Report emphasized the same sort of cooperation between the government and the volunteer public.

> The committee believes that this cooperation is consistent with the past participation of the various volunteer trail clubs, local citizenry, and the Federal and State Governments in locating and maintaining the Trail. The past administration of the Trail has been based on this partnership and it is the intent of the committee that the future administration of the Trail will continue in this manner. Encouraging the role of the volunteer in promoting, protecting and maintaining the Trail in [sic] sound public policy and should be continued.

Senate Report at 5, U.S. Code Cong. & Admin. News 1978, p. 459.

mendation that the Park Service acquire the 13.1 acre parcel. Deposition of Charles R. Rinaldi taken September 9, 1987 at 76 and 81. That recommendation was then reviewed by Rinaldi, the then Chief of the Land Acquisition Field Office, Appalachian National Scenic Trail, National Park Service. Rinaldi reviewed the relevant maps and Daniels' report and came to the independent conclusion that the acquisition was necessary. Rinaldi's consultation with a volunteer worker and subsequent considered acceptance of his recommendation does not support Mattin's claim of arbitrary and capricious decision making.

Mattin's second argument is that the acquisition of a larger border on the West side of the footpath, the land sought from Mattin, than exists on the East side of the footpath where the land is owned by the Park Service supports her defense. There is clearly no requirement in the statute that the corridor on each side of the trail be identical in width, nor would one expect such a requirement. What is required is that the Park Service use its expert judgment rationally in deciding what acquisitions are reasonably necessary to protect the trail at any given point. The Park Service has done that and it is not appropriate for Mattin or this Court to substitute its judgment for that of the Park Service and the Secretary.

Mattin next argues that because the Secretary has sought to acquire differing acres of Mattin's land over time, his ultimate decision to bring this action as to 13.1 acres is arbitrary and capricious. The fact is, however, that the United States reduced the number of acres it sought to acquire several times in efforts to accommodate Mattin and ultimately concluded that 13.1 acres was the minimum amount of land necessary to protect the trail.

The last argument Mattin makes is that decisions of whose property to acquire were made for political reasons. In support of this contention she brings to the Court's attention the case of William Ray, a California Republican, who apparently convinced the Department of the Interior to change its routing of the trail and therefore not condemn certain parts of his property. This demonstrates nothing more than that Ray achieved that same sort of limited success as did Mattin in negotiating with the Secretary. Indeed, a condemnation action was ultimately brought in this district to acquire 108.01 acres of Ray's land. *United States v. Ray*, 87 Civ. 1643 (TPG) (S.D.N.Y.).

These circumstances do not give rise to an argument that the Secretary's decision to acquire Mattin's land was arbitrary and capricious.

**3. Practicability of Maintaining Current Trail Route**

Mattin's fourth affirmative defense is that the relocation of the trail violates 16 U.S.C. § 1244(a)(1), which provides that "insofar as practicable" the trail shall remain as published in the NST–AT–101–May 1967 maps. As Mattin notes, Mattin Memorandum in Opposition at 7 n. 1, this defense is essentially subsumed in the second, namely the necessity of relocating the trail. This defense thus fails for the same reasons as discussed above.

**4. Exhaustion of Reasonable Efforts to Acquire Mattin Property**

■ Mattin's fifth and final affirmative defense is that the instant action is improper inasmuch as reasonable efforts to acquire her land by negotiation have not been exhausted as is mandated by the statute. 16 U.S.C. § 1246(g) ("Secretary may utilize condemnation proceedings without the consent of the owner to acquire private lands ... only in cases where, in his judgment, all reasonable efforts to acquire lands or interests therein by negotiation have failed"). The Secretary obviously made the determination that, in his judgment, condemnation was the only alternative in this case and I do not think that judgment irrational. The United States attempted over a period of five years to obtain Mattin's land without resorting to a condemnation proceeding and even after the start of this action settlement negotiations with Magistrate Roberts of this Court were held, albeit unsuccessfully. The United

States did what it could reasonably be expected to do in order to avoid condemning Mattin's land.

### Conclusion

Defendant Mattin's motion for summary judgment is denied.

Plaintiff's motion dismissing Mattin's affirmative defenses is granted.

Settle an order on seven (7) days' notice within ten (10) days of the date of this Opinion.

The foregoing is SO ORDERED.