# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-2133SD, 02-2144SD, 02-2185SD,
02-2187SD, 02-2191NE, 02-2305ND

_____

| | |
|---|---|
| _____ | * |
| | * |
| No. 02-2133SD | * |
| _____ | * |
| | * |
| State of South Dakota, and | * |
| William J. Janklow, Governor, | * |
| | * |
| Plaintiffs - Appellees, | * |
| | * |
| v. | * |
| | * |
| | * On Appeal from the United |
| Lt. Colonel Kurt F. Ubbelohde, | * States District Court |
| District Engineer, Omaha District, | * for the District of |
| United States Army Corps of | * South Dakota. |
| Engineers, and General David A. | * |
| Fastabend, Commander, NW Division, | * |
| Portland, Oregon, | * |
| | * |
| Defendants, | * |
| | * |
| | * |
| Mo-Ark Association, formerly | * |
| known as Missouri-Arkansas River | * |
| Basins Association, | * |
| | * |
| Movant - Appellant. | * |

_____

No. 02-2144SD

_____

State of South Dakota, and
William J. Janklow, Governor,

          Plaintiffs - Appellees,

  v.

Lt. Colonel Kurt F. Ubbelohde,
District Engineer, Omaha District,
United States Army Corps of
Engineers, and General David A.
Fastabend, Commander, NW Division,
Portland, Oregon,

          Defendants,

Ergon Asphalt and Emulsions, Inc.;
Magnolia Marine Transport
Company; Blaske Marine, Inc.;
Koch Materials Company; Mid-West
Terminal Warehouse Company, Inc.;
Tosco, a subsidiary of Phillips 66
Company; Jebro, Incorporated, and
Memco Barge Line, Inc.,

          Movants - Appellants.

On Appeal from the United
States District Court
for the District of
South Dakota.

-2-

_____

No. 02-2185SD

_____

State of South Dakota, and
William J. Janklow, Governor,

      Plaintiffs - Appellees,

  v.

Lt. Colonel Kurt F. Ubbelohde,
District Engineer, Omaha District,
United States Army Corps of
Engineers, and General David A.
Fastabend, Commander, NW Division,
Portland, Oregon,

      Defendants,

State of Nebraska,

      Movant - Appellant.

_____

No. 02-2187SD

_____

State of South Dakota, and
William J. Janklow, Governor,

      Plaintiffs - Appellees,

On Appeal from the United
States District Court
for the District of
South Dakota.

-3-

v.                               *   On Appeal from the United
                                 *   States District Court
                                 *   for the District of
Lt. Colonel Kurt F. Ubbelohde,   *   South Dakota.
District Engineer, Omaha District, *
United States Army Corps of       *
Engineers, and General David A.   *
Fastabend, Commander, NW Division, *
Portland, Oregon,                 *
                                 *
        Defendants - Appellants.  *
                                 *
        _____              *
                                 *
        No. 02-2191NE             *
        _____              *
                                 *
State of Nebraska, also known as  *
Don Stenberg, Attorney General of *
the State of Nebraska, ex rel.,   *
                                 *
        Plaintiff - Appellee,     *
                                 *
v.                               *
                                 *
                                 *
State of Missouri,                *
                                 *
        Intervener Below -        *
        Intervener on Appeal,     *
                                 *   On Appeal from the United
                                 *   States District Court
Kurt F. Ubbelohde, Lt. Colonel,   *   for the District of
District Engineer, Omaha District, *   Nebraska.
United States Army Corps of       *
Engineers, and General David A.   *
Fastabend, Commander, NW Division, *

-4-

Portland, Oregon,                        *
                                          *
            Defendants - Appellants,      *
                                          *
------------------------                  *
                                          *
State of Iowa,                            *
                                          *
            Amicus on Behalf of Appellee. *
                                          *
                                          *
            _____                  *
                                          *
            No. 02-2305ND                 *
            _____                  *
                                          *
State of North Dakota, and                *
John Hoeven, Governor,                    *
                                          *
            Plaintiffs - Appellees,       *
                                          *
      v.                                  *
                                          *  On Appeal from the United
                                          *  States District Court
Lt. Colonel Kurt F. Ubbelohde,            *  for the District of
District Engineer, Omaha District,        *  North Dakota.
United States Army Corps of               *
Engineers, and General David A.           *
Fastabend, Commander, NW Division,        *
Portland, Oregon,                         *
                                          *
            Defendants - Appellants.      *
                                          *
                                          *
State of Missouri,                        *
                                          *
            Intervener on Appeal.         *

_____

Submitted:  February 10, 2003

Filed:  June 4, 2003 (Corrected: July 29, 2003)
_____

Before WOLLMAN, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.
_____

RICHARD S. ARNOLD, Circuit Judge.


This case arises out of the management of the Missouri River, which runs through seven states in its journey from Montana to Missouri.  The United States Army Corps of Engineers is charged with the responsibility of managing this river and its attendant reservoirs.  In carrying out this charge, the Corps must strike a balance among many interests, including flood control, navigation, and recreation.  In good times, the Corps can accommodate all such interests, but, when facing a continuous drought, the Corps is forced to make hard choices.  In the Spring of 2002, the Missouri River Basin was in the midst of just such a prolonged drought.  The Corps decided to release water from a single reservoir, Lake Oahe, to maintain downstream river flow.  The State of South Dakota, where Lake Oahe is located, sought and received an injunction barring this release.  This action led other states to seek similar injunctions.  Within a period of days, courts had put four of the six mainstem reservoirs off limits for releases.  The State of Nebraska then sought and received an injunction requiring the Corps to maintain downstream river flow.

In this case we review the decisions of three district courts to issue preliminary injunctions binding the Corps.  District Courts in North Dakota and South Dakota enjoined the Corps from drawing down reservoirs located in their states for short periods of time, and a Nebraska District Court ordered the Corps to abide by its

governing Missouri River operations manual. We reverse the judgments of the District Courts in North Dakota and South Dakota and affirm the judgment of the Nebraska District Court.

## I.

Congress enacted the Flood Control Act of 1944 to provide for the orderly management of the Missouri River Basin. Pub. L. No. 78-534, 58 Stat. 887 (1944). The Act had numerous purposes. First, it entrusted the Army Corps of Engineers with the task of managing the River basin. The Corps is charged, for example, with constructing and managing the dams and reservoirs created by the Act, 16 U.S.C. § 460d, making contracts for use of surplus water available at the reservoirs, 33 U.S.C. § 708, and "prescrib[ing] regulations for the use of storage allocated for flood control or navigation at all reservoirs . . . the operation of any such project shall be in accordance with such regulations," 33 U.S.C. § 709.[1] The Act thus granted the Corps considerable power over the River basin.

The Act also laid out certain substantive interests that it was to serve. The dominant functions of the Flood Control Act were to avoid flooding and to maintain downstream navigation. ETSI Pipeline Project v. Missouri, 484 U.S. 495, 512 (1988). The Act's dominant functions were expressed repeatedly in three Congressional Documents: Senate Documents 191 and 247 and House Document 475. See Flood Control Act Section 9, 58 Stat. at 891. House Document 475, which represented one of two competing plans, confirmed this view, stressing flood control. H.R. Doc. No. 475, 78th Cong., 2d Sess. 28-29 (1944). At the same time, however, the Act recognizes secondary uses of the River including irrigation, recreation, fish,

---

[1]The Act also gave certain responsibilities to the Department of the Interior. See generally ETSI Pipeline Project v. Missouri, 484 U.S. 495 (1988). These responsibilities are not at issue in this case.

and wildlife.  See Flood Control Act Section 4, 58 Stat. at 889-90; 33 U.S.C. § 708; 43 U.S.C. § 390.  The House Document just cited noted that the management plan "would also provide for the most efficient utilization of waters of the Missouri River Basin for all purposes, including irrigation, navigation, power, domestic and sanitary purposes, wildlife, and recreation. "  H.R. Doc. No. 475, supra, at 29.  Senate Document 247, which reconciled the competing proposals, included a discussion of the purposes of Lake Oahe: "the irrigation of 750,000 acres of land . . . as well as to provide useful storage for flood control, navigation, the development of hydroelectric power, and other purposes."  S. Doc. No. 247, 78th Cong., 2d Sess. 3 (1944).  Thus, the Flood Control Act provided the Corps with a wide array of interests to consider in regulating the River.

While the Flood Control Act laid out broad goals, the intricacies of the River basin required the Corps to work out a specific management plan.  The Corps devised this more specific management plan and published it in the Missouri River Main Stem Reservoir System Reservoir Regulation Manual, commonly referred to as the Master Manual, which explains how the Corps is to go about managing the River system. The most recent version of the Master Manual was promulgated in 1979, although the Corps has been in the process of revising the manual since the late 1980's, and the Corps assures this Court that the revisions should be completed quite soon.

The Master Manual accomplishes numerous goals.  For one, Section IX lays out the "general approach" that is to be used to plan reservoir operation, an approach that calls for sequential consideration of the various interests. Predictably, it indicates that flood control will be provided for first. After flood control, the Manual calls for the Corps to consider (in order) irrigation, water supply and water-quality requirements, navigation and power, and finally recreation, fish, and wildlife. Notably, the final provision reads:  "insofar as possible without serious interference with the foregoing functions, the reservoirs will be operated for maximum benefit to recreation, fish and wildlife."  Master Manual Section 9-3.  In addition to laying out

this general approach, the Master Manual includes more specific technical guidelines. Thus, the Manual lays out minimum flows that are to be maintained at different points on the River, Master Manual Section 9-17, and methods for deciding the length of the navigation season based upon river flow at certain times of the year. Master Manual Section 9-18. The Master Manual also explains that the Corps has always promulgated Annual Operating Plans, which lay out the Corps's particular plan for the year. Master Manual Sections 9-47 & 9-48. These plans also give the public notice of the Corps's plan for operating the system, allowing interested individuals to order their affairs for the year.

The dispute in this case arose out of the prolonged drought conditions that the Missouri River has been experiencing over the last several years. This shortage of water has forced the Corps to make decisions about the allocation of water between the states and between different interests. Pursuant to its 2002 Annual Operating Plan, the Corps decided to release water from Lake Oahe in South Dakota to maintain downstream navigation on the Missouri River. At the same time, the Corps was planning on holding water levels constant at the other five reservoirs. The Corps generally lowers only one reservoir if releases are necessary to maintain navigation, and it attempts to shift this burden from year to year. Because Lake Oahe's water level had not been reduced the year before (it had actually increased), the Corps chose Lake Oahe to bear the burden of the drought in 2002.

The Corps's plan to release water from Lake Oahe was troubling to South Dakota, because it wanted the water level of Lake Oahe to be held constant from late April to late May to allow for a fruitful fish spawn during that period. Lake Oahe has become a well-known destination for trophy walleye fishing. Since 1997, however, the State noticed a marked reduction in the quality of fish in the lake — a reduction that has reduced recreation at the lake. The State concluded that this reduced quality was caused by a sizable decrease in the number of rainbow smelt, the prey fish of the walleye. This decrease was due in part to a massive water release from Lake Oahe

in 1997 and in part to the overpopulation of walleye. South Dakota set out to remedy this problem by allowing for increased walleye fishing, which would reduce the number of predators of the rainbow smelt. After this increased fishing, the State concluded that the rainbow smelt were poised to have an extremely fruitful spawn in 2002. Because the smelt lay their eggs in shallow water, however, the spawn would not be successful if the water level was reduced even by as little as six inches. South Dakota therefore asked the Corps to forego its plans to release water from Lake Oahe during the smelt's spawning season — late April until late May. The Corps indicated that it nevertheless intended to abide by its annual operating plan, which called on the Corps to continue the releases from Lake Oahe to maintain downstream navigation.

On April 25, 2002, after the Corps refused to change its plans, the State of South Dakota filed suit in the District Court for South Dakota. The suit claimed that the Corps acted arbitrarily and capriciously in maintaining downstream navigation rather than maximizing recreation at upstream reservoirs. The suit sought a declaration that the Corps's practice of always requiring one of the reservoirs to bear the burden of a drought was unlawful. The suit sought to enjoin the Corps from releasing water from Lake Oahe until after the spawning season. After a hearing, the Court entered a temporary restraining order requiring the Corps to maintain the water level until a preliminary-injunction hearing could be held. When the Court entered this restraining order, the Corps announced its intention to release water from Lake Francis Case to offset its inability to lower Lake Oahe. Lake Francis Case is also in South Dakota, and the State requested that the District Court consider the propriety of lowering Lake Francis Case at the preliminary injunction hearing. Before the preliminary-injunction hearing, the State of Nebraska and numerous private entities moved to intervene in the case, but the Court denied these motions. After hearing arguments from all sides on May 9 and 10, the District Court entered a preliminary injunction that required the Corps to maintain the water level at both Lake Oahe and Lake Francis Case until May 25 — the end of the spawning season.

[2]The Corps then planned to lower Fort Peck Reservoir in Montana, but as in North Dakota and South Dakota, Montana went to court and obtained an injunction

each of the injunctions on May 22, 2002. The injunctions in North Dakota and South Dakota expired by their own terms on May 25, 2002. The Nebraska District Court's injunction has not expired and will go into effect again if we lift our stay.

## II.

We must decide whether the three District Courts erred in enjoining the Corps and whether the South Dakota Court erred in denying the motions to intervene. We conclude that the District Courts in North Dakota and South Dakota erred in enjoining the Corps from lowering reservoirs to maintain navigation, and that the District Court in Nebraska correctly ordered the Corps to follow the Master Manual. We also conclude that the South Dakota District Court erred in denying the motions to intervene.

## A.

Before reaching the merits of this case, we must consider whether the expiration of the preliminary injunctions in North Dakota and South Dakota renders the appeals of those orders moot. Although none of the parties to this appeal has urged this Court to dismiss the case, we must nevertheless satisfy ourselves that this case is not moot. See Kremens v. Bartley, 431 U.S. 119, 136 (1977). We are so satisfied for numerous reasons. First, we note that the injunction issued by the District Court in Nebraska is still in effect, so the Corps's appeal from that injunction is clearly not moot, and many, if not all, of the substantive issues raised by the South Dakota and North Dakota appeals will be decided anyway.

The North Dakota and South Dakota cases fall within the well-known "capable of repetition, yet evading review" exception to the mootness doctrine. Weinstein v. Bradford, 423 U.S. 147, 149 (1975). This exception applies when two conditions are met: "(1) the challenged action [is] in its duration too short to be fully litigated prior

-12-

to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." Spencer v. Kemna, 523 U.S. 1, 17 (1998).

A preliminary injunction that bars the Corps from releasing water from the reservoirs during spawning will never last long enough to allow for full litigation because of the brevity of spawning season. Thus, if these actions were to recur, they would continually evade review. Moreover, we have every reason to suspect that these events will recur. On previous occasions, we were inclined to think this type of litigation would not repeat itself. See South Dakota v. Hazen, 914 F.2d 147 (8th Cir. 1990) (deciding case was moot because the injunction had expired); cf. Missouri ex rel. Nixon v. Craig, 163 F.3d 482 (8th Cir. 1998) (deciding that a challenge to the Corps's annual operating plan was moot because the plan had lapsed). But repetition now seems quite likely. At oral argument the parties agreed that drought conditions continue along the River, meaning that the Corps will again be forced to choose between releasing water from the reservoirs or letting downstream navigation suffer. We have every reason to believe that the Corps will choose to release water from at least one reservoir, and we are confident that the legality of such a release would again be challenged in the courts. In the end, then, we are persuaded that the questions presented in this appeal are likely to recur, yet will evade review when they do. Therefore, the expirations of the preliminary injunctions do not render the appeals moot.

B.

Next, we must decide whether the South Dakota District Court erred in refusing to allow various parties to intervene in the case brought by the State of South Dakota. After the initiation of the suit by South Dakota, the District Court received three separate motions to intervene as of right under Federal Rule of Civil Procedure 24(a)(2): one from MO-ARK Association, one from Ergon Asphalt and Emulsions,

-13-

Inc., and other corporate entities, and one from the State of Nebraska.[3]  A party seeking to intervene must establish both that it has standing to complain and that the elements of Rule 24(a)(2) are met.  Rule 24(a)(2) requires that the proposed intervenor establish that it claims an interest in the property or transaction which is the subject of the litigation, that disposition of the litigation in the party's absence may impede or impair its ability to protect its interest, and that the interest is not adequately represented by the current parties to the suit.  Fed. R. Civ. P. 24(a)(2); Jenkins v. Missouri, 78 F.3d 1270, 1274 (8th Cir. 1996).  The South Dakota District Court concluded that the proposed intervenors failed to prove that they had standing and failed to meet the requirements of Rule 24(a)(2).  Additionally, the Court concluded that allowing the State of Nebraska to intervene would be problematic because it would put Nebraska and South Dakota on opposite sides of the dispute, thus bringing the case within the exclusive jurisdiction of the Supreme Court.

We review the District Court's conclusion that these parties were not entitled to intervene de novo.  Arrow v. Gambler's Supply, Inc., 55 F.3d 407, 409-10 (8th Cir. 1995).  The proposed intervenors presented sufficient evidence of their interest in the case to give them standing to intervene.  Each of the proposed intervenors presented substantial evidence that the remedies sought by the State of South Dakota threatened it with serious injury.  MO-ARK represents numerous interests along the Missouri River, including members with interests in navigation, agriculture, and water treatment. Ergon and the corporate entities that joined its motion to intervene utilize the lower Missouri River to transport their goods.  And the Missouri River runs through the State of Nebraska.  Each of these proposed intervenors claimed an interest in the litigation based upon the fear that the Court's ruling would lead to decreased water flow downstream.  They offered to present significant evidence that

_____

[3]The proposed intervenors also sought permissive intervention, and the State of Nebraska moved to be allowed to join as an indispensable party under Rule 19. Because we ultimately rule that each of the intervenors was entitled to intervene as a matter of right, we need not reach these alternative theories.

-14-

a reduction in the flow of the River would cause a great deal of harm to downstream interests. Among the threats were an interruption in their ability to navigate the River, problems for power plants that relied upon the River water for cooling, and decreases in water quality for community water supplies. Moreover, the parties presented evidence that decreasing the flow for even a short period of time could be troublesome because of the effects that such a short-term reduction could have on wildlife. Specifically, the parties presented evidence that if the water levels were decreased, two endangered species of birds would nest on the newly exposed river bed. Once these birds nested, the proposed intervenors feared, the water flow could not be increased until after the fledgling birds could leave the nest. Thus, according to this argument, flow reduction could not be limited to a short term.

The Court did not disagree with this evidence, but merely held that it did not believe that its order would lead to a reduction in downstream flow. The Court noted that it was not ordering the Corps to reduce downstream flows, but only to maintain the water levels at the South Dakota Reservoirs. Thus, the Corps was free to maintain the downstream flows by lowering water levels at other reservoirs. The Court found that because its preliminary order would not require a reduction in flow, the proposed intervenors did not have an interest in the litigation. This finding led the Court to reject the motion to intervene not only on Rule 24 grounds but also for lack of standing. However, the proposed intervenors did not move to intervene in only the preliminary-injunction hearings. Instead, they sought to intervene in the whole case. As the proposed intervenors explain, the State of South Dakota was seeking more than a preliminary injunction for the short period of time that it lasted. South Dakota is also seeking a more permanent, forward-looking declaration that will affect the way the Missouri River is managed in the future. South Dakota alleges that the Corps should "give all water uses equal consideration while the Master Manual Review is undergoing a revision," First Amend. Compl. ¶ 39, and to accomplish this goal seeks injunctive relief "to prevent irreparable harm to the fisheries of the mainstream reservoirs, when the harm is inflected [sic] to benefit downstream navigation." Id.

-15-

at ¶ 55.  If South Dakota ultimately prevails in this case, the Corps may be forced to reduce downstream flows in drought conditions to maintain the water levels at all of the reservoirs.  When we consider the effect that an ultimate ruling for South Dakota might have, we think the proposed intervenors presented sufficient evidence of a threatened injury to give them standing.

The District Court did not base its decision solely upon its conclusion that the proposed intervenors lacked standing; the Court also concluded that the proposed intervenors had not proved that they were entitled to intervene under Rule 24(a)(2).  The Court first concluded that the proposed intervenors had not shown that they had an interest in the litigation.  Again, we disagree.  Success by South Dakota in the whole litigation would impair the proposed intervenors' interests in the operation of the River.

The Court also concluded that the proposed intervenors were not entitled to participate in the action because their interests were adequately represented by the Corps under the parens patriae theory.  This theory creates a presumption that a government agency will represent the interests of all citizens in cases raising matters of sovereign interest.  Mausolf v. Babbitt, 85 F.3d 1295, 1303 (8th Cir. 1996).  Proposed intervenors can rebut this presumption, however, if they can make a strong showing of inadequate representation, for example, by showing that the proposed intervenor's interest is not subsumed within the general interests of the public.  Id.  The District Court concluded that the presumption applied in this case, and that the proposed intervenors had not overcome it.  We respectfully disagree.

The Mausolf case is instructive.  There, snowmobile enthusiasts sued the Secretary of the Interior, seeking to enjoin the enforcement of certain snowmobiling restrictions in a federal park.  Various conservationist organizations moved to intervene in the case for fear that the Secretary would settle the case or back away from his rules.  The District Court denied intervention, partly because of the parens

-16-

patriae presumption. This Court reversed, finding that the presumption was rebutted. We noted that the government must represent the interests of all of its citizens, which often requires the government to weigh competing interests and favor one interest over another. Where such conflicts exist, "even the Government cannot always adequately represent conflicting interests at the same time." Id. at 1303.

This case presents just such a conflict. The Corps is charged with managing the Missouri River system as a whole — a charge that requires it to balance the interests of the upstream and downstream users. The proposed intervenors, on the other hand, wish to represent exclusively downstream interests. Indeed, South Dakota's lawsuit itself indicates a fear that the Corps cannot adequately represent the interests of all parties. The very crux of this suit is that the Corps has failed in its representative role. Yet South Dakota asks this Court to hold that the Corps will adequately represent downstream users. We decline to do so. Given that the Corps is asked to balance multiple interests, we conclude that it cannot adequately represent the interests of downstream users in this case. The parens patriae presumption, therefore, does not present an obstacle to intervention. Thus, the proposed intervenors met the requirements for intervention under Rule 24(a)(2) and were entitled to intervene.

The District Court presented an additional reason for not allowing the State of Nebraska to intervene — the Court feared that doing so would strip the Court of jurisdiction. The Court worried that allowing Nebraska to intervene would create a case or controversy between two states — a controversy within the Supreme Court's exclusive original jurisdiction. This was not an appropriate reason for rejecting Nebraska's motion to intervene, however, because, even had Nebraska been allowed to intervene, the controversy would not have been between South Dakota and Nebraska. The Supreme Court's exclusive jurisdiction under 28 U.S.C. § 1251(a) applies only when one state seeks relief from another state. See Mississippi v. Louisiana, 506 U.S. 73, 78 n.2 (1992) ("Louisiana's intervention is also unaffected

-17-

by § 1251(a) because it does not seek relief against Mississippi."); see also United States v. Nevada, 412 U.S. 534, 537 (1973) (per curiam) ("The complaint . . . is not one alleging a case or controversy between two States within the exclusive jurisdiction of this Court, under 28 U.S.C. § 1251(a), but a dispute between the United States and two States over which this Court has original but not exclusive jurisdiction under § 1251(b)(2)."); Connecticut v. Cahill, 217 F.3d 93 (2d Cir. 2000) (holding that Connecticut could maintain an action against officers of New York in federal district court because the action was styled as a suit against officers, not the state). In this case, the controversy is between each of the states and the Corps. Although the states would have had adverse interests, each state would be seeking relief from the Court against the Corps. Thus, allowing intervention by Nebraska would not strip the District Court of jurisdiction.

The District Court's denials of the motions to intervene are reversed.

## III.

We now turn our attention to the question of whether the District Courts erred in issuing preliminary injunctions in these cases. The decision to issue a preliminary injunction is within a district court's discretion in the first instance. The following factors govern the exercise of that discretion:

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). We review a district court's decision to grant a preliminary injunction for abuse of discretion, and can reverse such an injunction only if the district court

"clearly erred in its characterization of the facts, made a mistake of law, or abused its discretion in considering the equities." Bhd. of Maint. of Way Employees v. Burlington Northern R.R., 802 F.2d 1016, 1020 (8th Cir. 1986).

The facts of these cases are largely undisputed, and the District Courts did not clearly err in their fact finding. All sides seem to agree that each of the plaintiffs can show that they will suffer irreparable harm absent the injunctions imposed. The States of North Dakota and South Dakota demonstrated that the population of fish in the reservoirs would decrease if the water levels were not maintained. Each state presented evidence that such a decrease would lead to a decrease in recreation on the reservoirs. Nebraska presented evidence that it would be harmed by the Corps's failure to follow the Master Manual, because the decreased flows would harm many of its citizens. In each case, the District Court concluded that the complaining party would suffer irreparable harm without an injunction. There was no clear error here.

The balance-of-harms and public-interest criteria present closer questions, but we need not pursue these issues. The dispositive issue on this appeal is the likelihood that each plaintiff would succeed on the merits. In each of these cases, the plaintiffs are challenging agency actions. Thus, our review is guided by the Administrative Procedure Act. Under the APA, district courts review agency actions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In this case, however, the review is more complicated, because the Corps maintains that its actions are not subject to judicial review at all. It contends that the Flood Control Act commits these decisions to the Corps's discretion. See 5 U.S.C. § 701(a)(2). Thus, before considering whether the Corps's actions were unlawful or were arbitrary and capricious, we must decide whether the Corps's actions are subject to judicial review.

## A. Is There Law To Apply?

The Corps first argues that the District Courts erred because its actions are not subject to judicial review. As a general rule, courts presume that Congress intended agency action to be subject to judicial review. Kenney v. Glickman, 96 F.3d 1118, 1124 (8th Cir. 1996); see also 5 U.S.C. § 702. There is a very narrow exception to this presumption "applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (internal quotations omitted). This exception is quite narrow and does not apply where statutes provide even minimal guidance to limit agency discretion. Id. at 411-13 (holding that an agency action was subject to review because the granting statute provided factors for the agency to consider in making the decision). And courts can find law to apply either "in the underlying statute or in the regulations by the agency interpreting the underlying statute." Kenney, 96 F.3d at 1124. Thus, to prevail on its claim that its actions are not subject to judicial review, the Corps must demonstrate that neither the Flood Control Act nor any of its internal regulations provides law to apply in these cases. We reject this argument. We conclude that the Corps's actions are constrained both by the Flood Control Act and by the Master Manual.

The Flood Control Act clearly gives a good deal of discretion to the Corps in the management of the River. But this discretion is not unconstrained; the Act lays out purposes that the Corps is to consider in managing the River. The Act recognizes what the Supreme Court has called the dominant functions of the River's reservoir system — flood control and navigation. ETSI Pipeline Project v. Missouri, 484 U.S. 495, 512 (1988). While flood control and navigation are dominant functions, the Act also recognizes recreation and other interests and secondary uses that should be provided for. Flood Control Act Section 4, 58 Stat. at 889-90. The text of the Flood Control Act thus sets up a balance between flood control, navigation, recreation, and other interests. Because the Flood Control Act calls on the Corps to balance these

various interests, the courts can review the Corps's decisions to ensure that it considered each of these interests before making a decision. What the text of the Act does not provide is a method of deciding whether the balance actually struck by the Corps in a given case is correct or not. Nevertheless, the Flood Control Act clearly provides some law to apply, so the decisions of the Corps are subject to judicial review under the Act.

The minimal guidance provided by the Flood Control Act is only the beginning of our inquiry, however. We turn next to the Master Manual to decide whether it binds the Corps. The Corps has promulgated the Master Manual, which sets out priorities and directs the Corps to take certain actions in given situations. Upon close examination, we conclude that the Master Manual is binding on the Corps because it sets out substantive requirements, and its language and context indicate that it was intended to bind the Corps's discretion.

The Corps maintains that the Manual is not binding because it is not a rule, merely a policy statement. Indeed, the Master Manual was not promulgated through the notice-and-comment rulemaking procedures of the Administrative Procedure Act. This does not by itself render the Master Manual non-binding. Agency statements can be binding upon the agency absent notice-and-comment rulemaking in certain circumstances. Where a policy statement purports to create substantive requirements, it can be a legislative rule regardless of the agency's characterization. Northwest National Bank v. United States Dep't of the Treasury, 917 F.2d 1111, 1116-17 (8th Cir. 1990); see also Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 94 (D.C. Cir. 1997) (holding that policy statements can become binding on the agency if so intended, which is a determination made by examining the statement's language and context).

The language of the Master Manual itself implies that it is binding. Throughout, the Manual speaks of what "is" done or "will" be done. Section 9-3 of the Manual, for example, explains that the "general approach, which was developed

and generally agreed upon during planning and design of the reservoirs, is observed in operation planning and subsequent reservoir regulation procedures."  Master Manual Section 9-3 (emphasis added).  This general approach prioritizes the different interests that will be considered in regulating the reservoirs.  The interests are to be provided for in this order:  flood control, irrigation and upstream beneficial uses, downstream water supply, navigation and power, power generation, and finally recreation and wildlife.  In the midst of this prioritization, the Master Manual speaks in mandatory terms.  Focusing on the areas of most interest to this case, the fourth priority section reads: "the remaining water supply available will be regulated in such a manner that the outflow from the reservoir system at Gavins Point provides for equitable service to navigation and power."  Id. (emphasis added).  Two paragraphs later, the Manual indicates that recreation, fish, and wildlife will be provided for insofar as possible, but consistently with the preceding considerations (including navigation).  Section 9-3 itself seems to indicate that the Manual was intended to bind the Corps, and later provisions bolster this conclusion.

In addition to sections, like Section 9-3, which explain general priorities and goals, the Master Manual also includes provisions that direct the Corps to take certain actions when given circumstances occur.  In Section 9-19, for example, the Manual provides that "Fall extensions of the navigation season beyond the normal 8-month length will be scheduled" when certain triggering events occur.  Other provisions require the Corps to maintain minimum flow levels at various points on the River at different times.  See generally Master Manual Section 9.  These provisions can hardly be termed non-binding; they, like Section 9-3, speak of what the Corps will do in given circumstances.  The Manual's provisions, then, do not merely give advice to administrators; instead, they direct the operation of the River.  There is no indication in the text of the Manual that the Corps is free to ignore its provisions if it so chooses.

Indeed, the language of the Manual appears to assume that members of the Corps must follow its provisions.[4]

In addition to the Master Manual itself, the Corps's promulgated regulations indicate that the Manual is binding. The Code of Federal Regulations includes a section that "prescribes policies and procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control management activities, including establishment of water control plans for Corps and non-Corps projects as required by Federal laws and directives." 33 C.F.R. § 222.5 (2002). The regulation goes on to require the Corps to develop water control plans "to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports," and indicates that "[t]horough analysis and testing studies will be made as necessary to establish the optimum water control plans possible within prevailing constraints." Id. § 222.5(f). "[P]lans developed for specific projects and reservoir systems will be clearly documented in appropriate water control manuals." Id. The regulation also recognizes the need to create a "Master Manual" in cases where several projects are linked together. Id. § 222.5(i)(2). These manuals are to be created with the aid of public involvement. Id. § 222.5(g)(2). And once produced, these plans are to be made publicly available. Id. § 222.5(g)(2)(ii). These provisions support the conclusion that the Manual binds the Corps. The most significant of these provisions is the indication that in creating Master Manuals, the Corps will consider public comment on its plans and then publicize the completed plans. The public-comment provision recognizes the power that these Manuals wield — a power that should be exercised only after public consideration. The provision which makes these manuals publicly available likewise recognizes that these manuals will affect

_____

[4]The Master Manual contains various other provisions that bolster this conclusion, including a provision that the Manual may be revised when necessary. Master Manual Section I. If the Manual were non-binding, there would be little need to include a provision allowing for revision; the Corps could simply ignore the Manual entirely.

-23-

individuals, and that potentially affected people should have access to the documents. These are not the types of procedures one would expect in the promulgation of an internal, non-binding agency guideline.

Moreover, the Corps's treatment of the Manual indicates that it is binding. Lawrence Cieslak, a member of the Corps, indicated in his testimony to the South Dakota District Court that all of the critical decisions that were made in the Spring of 2002 were based upon the instructions in the Master Manual. The Corps decided the length of the navigation season and decided not to cut the releases from the reservoirs because the Master Manual instructed as much. Moreover, Mr. Cieslak concluded his testimony by observing that "we have stated that we will continue to try to meet the operational objectives of the current Master Manual," until a revised manual is completed. Appendix at 792. As this testimony demonstrates, the Corps continues to treat the Master Manual as a how-to manual for operating the Missouri River. The Corps has treated and continues to treat the Master Manual as a constraint on its discretion in operating the River.

Because the language and context of the Master Manual and the Corps's treatment of the manual indicate that it binds the Corps, we conclude that it is binding. The Corps is not free to ignore the Master Manual (though it may elaborate upon details of operation in its annual operating plans), and courts can review the Corps's actions to ensure conformity. In the end, then, there is sufficient law to apply in these cases. In each case, courts can assess whether the Corps's actions run afoul of either the Flood Control Act or the Master Manual.

## B. South Dakota

We turn our attention first to the injunction entered by the South Dakota District Court. The Court enjoined the Corps from releasing water from either Lake Oahe or Lake Francis Case. The State of South Dakota claimed that it was entitled

to this relief on three grounds. First, it alleged that the Flood Control Act requires the Corps to act so as to maximize all interests on the River, including recreation. Second, the State argues that it is entitled to relief because the Corps is judicially estopped to favor navigation over recreation. Finally, South Dakota maintains that the Corps acted arbitrarily and capriciously in favoring navigation over recreation. We hold that none of these arguments is likely to succeed on the merits.

South Dakota argues that the Flood Control Act requires the Corps to maximize the benefits of the River, including fish-and-wildlife benefits.[5] This argument is not based upon the text of the statute, but instead upon the Act's legislative history. Senate Document 247 states that the plan "will secure the maximum benefits for flood control, irrigation, navigation, power, domestic and sanitary purposes, wildlife, and recreation." S. Doc. No. 247, at 5; see also H.R. Doc. No. 475, at 29 ("the comprehensive plan would . . . provide for the most efficient utilization of the waters of the Missouri River Basin for all purposes, including irrigation, navigation, power, domestic and sanitary purposes, wildlife, and recreation."); id. at 3 ("When completed the basin plan will be operated for maximum multiple purpose use."). Moreover, Senate Document 191, which represented one of the original competing views, included a provision that stated that "during the spawning season every effort will be made to maintain as constant a pool level as possible." S. Doc. No. 191, 78th Cong., 2d Sess. 211 (1944). South Dakota maintains that the sum total of this legislative history compels the Corps to balance the interests each year so as to maximize each category of benefits, and that courts can review the annual operating plans to ensure that they do indeed maximize the benefits.

We reject this argument. South Dakota's proffered standard — whether the Corps's management of the River maximizes the benefits to all interests — is not the

_____

[5]South Dakota does not argue that the Corps's decision to release water from Lake Oahe was contrary to the Master Manual.

kind of standard that courts regularly employ in reviewing agency action. As a general rule, courts defer to agency policy decisions because it is not a court's "function to substitute [its] judgment for that of the agency." Aman & Mayton, Administrative Law § 13.10.2 (1993). Under South Dakota's proffered standard the Corps's actions would receive no deference and the courts could be called upon to review every decision that the Corps makes, no matter how minute. Although Congress could give the courts the power to engage in such searching review, we do not believe that the portions of the Flood Control Act's legislative history to which South Dakota directs this Court are sufficient to achieve such a radical shift from the normal standard of review. Indeed, the statements that South Dakota points to are merely general statements of policy goals. They are not phrased as limitations on the Corps's discretion. Given that this argument finds no support in the text of the statute, and given the vagueness of the legislative history on the matter, we refuse to apply South Dakota's proffered standard. Courts are simply not empowered to review every decision of the Corps to ensure that it maximizes the benefits of the River for all interests. Indeed, such a standard would be impossible to meet, anyway. In times of drought it is not possible for both navigation and fishery benefits to be maximized. Something has to give.

South Dakota next argues that judicial estoppel requires the Corps to give equal consideration to recreation and other interests including navigation. This argument is based upon an agreement reached in previous litigation in Montana. There, South Dakota maintains, the Corps agreed to give all interests, including recreation, equal consideration in the management of the River — as opposed to giving flood control, navigation, or other interests priority over recreation — until the revision of the Master Manual was complete. Even assuming that the elements of judicial estoppel were met in this case,[6] the only thing that the Corps agreed to was that it would give

---

[6]Because we rule that there is no evidence that the Corps failed to give equal consideration to recreation, we do not reach the question of whether the elements of

-26-

all interests equal consideration. S.D. Brief at 27 (citing the ruling in a previous suit that gave rise to the judicial estoppel claim). Equal consideration does not mean equal results. In this case, South Dakota has presented no evidence that the Corps did not give equal consideration to recreation; only that in the end, the Corps decided to lower one reservoir per year during a drought to maintain navigation. This result could easily arise from the Corps's giving equal consideration to each interest. Indeed, the Corps maintains that it considered the interests of recreation equally. Testimony of Lawrence Cieslak, App. at 823 ("[I]n the Annual Operating Plan we are giving equal consideration to all of the project purposes in trying to meet the operation objectives.") The Corps concluded that it does not need to hold the water level at every reservoir constant every year to allow recreational activities to flourish. The evidence before the Corps indicated that a good fish spawn once every four to five years is sufficient to maintain the fisheries of each reservoir. Master Manual Section 9-31. According to this conclusion, then, the Corps can lower each reservoir on a rotating basis (one per year) and still maintain the fish stock in the reservoirs. Given this fact, the Corps's decision to lower one reservoir per year during a drought simply does not provide any proof that the Corps was not giving recreation equal consideration. South Dakota is unlikely to succeed on its judicial-estoppel theory.

Finally, we must consider whether the Corps's decision to lower Lake Oahe in the Spring of 2002 to maintain downstream navigation was arbitrary and capricious. See 5 U.S.C. § 706(2)(A). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Overton Park, 401 U.S. at 416 (citations omitted). To pass scrutiny, "[t]he agency must articulate a rational connection between the facts found and the choice made." Bowman Transp., Inc. v.

judicial estoppel were met in this case.

Arkansas-Best Freight Systems, Inc., 419 U.S. 281, 288 (1974) (internal quotations omitted). This standard of review gives great deference to the policy decisions made by the agency and does not allow a court to overturn an agency action merely because the court would have acted differently; a court may find an action to be arbitrary and capricious only when there is no rational basis for the policy choice.

The policy choice that South Dakota is challenging is not arbitrary and capricious. The Corps provided a rational basis for its decision to lower one reservoir per year during drought conditions. The Corps had evidence that every reservoir did not need to have a good spawn each year to maintain the fish stocks. Thus, so long as each reservoir's water level was not lowered every year, the fish stocks in the reservoirs would not be irreparably harmed. The Corps decided to alternate the harm among the reservoirs, maintaining the water level at all but one reservoir each year. This plan would presumably allow each reservoir to have a fruitful spawn five out of every six years even in the worst drought conditions. This plan was eminently rational. South Dakota's efforts to increase the rainbow smelt stock during the Spring of 2002 do not make the plan irrational. South Dakota knew that Lake Oahe's water level had not been lowered in 2001, and that it was thus among the candidates to be lowered in 2002. Moreover, if Lake Oahe had been lowered as planned in 2002, it presumably would not be lowered in 2003, which would allow for a fruitful spawn this year. The Corps's policy was not irrational when written and did not become irrational in the Spring of 2002 because of South Dakota's efforts on Lake Oahe. South Dakota, therefore, is not likely to succeed on its theory that the Corps acted arbitrarily and capriciously.

Because none of South Dakota's theories for relief is likely to succeed on the merits, it was not entitled to a preliminary injunction. We therefore reverse the preliminary injunction entered in the South Dakota District Court and remand the case to that Court for further proceedings consistent with this opinion.

## C. North Dakota

The arguments raised by North Dakota in favor of affirming the injunction entered in the North Dakota District Court are quite similar to those made by South Dakota. Having already rejected South Dakota's judicial-estoppel theory and its argument that the Corps's policy to release water from one reservoir per year is arbitrary and capricious, we need not address these arguments again. In addition, North Dakota argues that the Flood Control Act itself precludes the Corps from favoring navigation over recreation. This argument is simply incorrect; the Flood Control Act does not require the Corps to give equal treatment to recreation. The Flood Control Act provides little guidance about what priority the Corps can or must give to different interests. The evidence that we do have, including the sequential listing of interests that uniformly lists navigation before recreation, indicates that the Corps's primary concerns should be flood control and navigation. The Supreme Court appears to have accepted as much. ETSI, 484 U.S. at 512. The Corps has adopted this prioritization, as evidenced by the listing of interests in Section 9-3 of the Master Manual. The Corps's decision to adopt this prioritization was not impermissible.

Because, like South Dakota, North Dakota has not demonstrated that it is likely to succeed on the merits, the North Dakota District Court erred in entering a preliminary injunction in its favor. We therefore reverse the preliminary injunction and remand this case to the District Court for further proceedings consistent with this opinion.

## D. Nebraska

The preliminary injunction entered in the Nebraska District Court was wholly different from those entered in North Dakota and South Dakota. The Nebraska District Court ordered the Corps to abide by the Master Manual because it concluded

that the Manual binds the Corps. We can find no error with this conclusion. The Master Manual does bind the Corps, and under 5 U.S.C. § 706, Nebraska was entitled to an order that the Corps abide by its own formally adopted policies.

The Corps argues strenuously against the preliminary injunction entered in Nebraska. It feels that it should not be bound by the Manual when unforeseen circumstances arise. The record before this Court does not allow us to assess the validity of this argument on this appeal. Probably the Corps should be accorded some flexibility if an unforeseen circumstance arises. We leave such questions to the District Court to decide on remand if necessary. The Nebraska District Court order granting a preliminary injunction is affirmed, and the stay entered by this Court is vacated. This case is remanded to the District Court for proceedings consistent with this opinion.

IV.

In summary, we conclude that the South Dakota District Court erred in denying the motions to intervene and in entering a preliminary injunction requiring the Corps to maintain the water level at Lakes Oahe and Francis Case. The Court's orders are, therefore, reversed, and the case is remanded for proceedings consistent with this opinion.

We likewise conclude that the North Dakota District Court erred in enjoining the Corps from releasing water from Lake Sakakawea. That Court's order is, therefore, reversed, and the case is remanded for proceedings consistent with this opinion.

Finally, we conclude that the Nebraska District Court did not err in entering a preliminary injunction requiring the Corps to follow the Master Manual. That Court's

order is, therefore, affirmed, and the case remanded for proceedings consistent with this opinion.

The motion for an expanded stay is denied as moot.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.