JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE
Now before the Court are the motion for summary judgment filed by Plaintiffs Sierra Club and A Community Voice-Louisiana ("Plaintiffs") and the cross-motion for summary judgment filed by Defendant Scott Pruit, in his official capacity as the Administrator of the United States Environmental Protection Agency ("EPA"). This action addresses whether the EPA's most recent year-long delay in implementation of formaldehyde emission standards exceeds its statutory authority under the Formaldehyde Standards in Composite Wood Products Act. See 15 U.S.C. § 2697 (the "Formaldehyde Act" or the "Act").
A. Procedural History of the Formaldehyde Standards Act and Agency Regulations.
The Formaldehyde Act was passed by Congress and signed into law in 2010 and was codified as Title VI of the Toxic Substances Control Act ("TSCA") ). The Formaldehyde Act set out emission standards for domestically manufactured and imported composite wood products and the directed the Administrator of the EPA, by no later than July 1, 2013, to promulgate implementing regulations that would ensure compliance with the new emission standards.
Formaldehyde is used in the manufacture and fabrication of composite wood products, such as hardwood plywood, medium-density fiberboard, and particleboard. These products are comprised of wood pieces, chips, particles, and fibers bonded together with formaldehyde-based resin. These composite wood products containing formaldehyde are incorporated into a variety of household products, including paneling, flooring, cabinets, shelving, furniture and countertops. 81 Fed. Reg. 89,676 -79 (December 12, 2016).
Formaldehyde has been classified as a known carcinogen, a cause of myeloid leukemia, respiratory-related health problems, and reduced fertility, and dangerous to children's health. The carcinogen has been correlated with nasopharyngeal cancer, eye, nose and throat irritation, increased risk of chronic respiratory symptoms, decreased pulmonary function, and *1054 increased risk and severity of childhood allergies and asthma. Id.
In the legislative history of the Formaldehyde Act, it is clear that Congress was concerned with severe adverse health effects of formaldehyde emissions from composite wood products following reports of cases of toxicity from storm victims who were displaced by Hurricane Katrina. Survivors of the storm were housed in trailers provided by the Federal Emergency Management Agency ("FEMA"). The hastily-manufactured temporary trailers and shelters made of composite wood products were provided to displaced people after the hurricane. The trailers were widely provided to a high number of people in vulnerable populations, especially children, the elderly, and people with preexisting health problems. Worsened by the hot and humid aftermath of the storm, many occupants of the FEMA trailers containing high levels of formaldehyde reported significant adverse health consequences, such as nosebleeds, headaches, eye and skin irritation, asthma and respiratory problems, and other ailments. See 156 Cong. Rec. H4704 (daily ed. June 23, 2010) at 11375; see also Declaration of Leslie G. Fields ("Fields Decl.") at ¶ 4; Declaration of Beth Butler at ¶¶ 3-4; Declaration of Jesse John Fineran at ¶¶ 6, 9-11; Declaration of Louis Finkle at ¶¶ 6-10; Declaration of Vanessa Gueringer at ¶¶ 6-9.)
In 1992, the California Air Resources Board ("CARB") had classified formaldehyde as a toxic air contaminant and determined that there was no safe level of exposure. In 2007, following news of adverse health effects caused by the FEMA trailers, CARB approved the Airborne Toxics Control Measure to reduce formaldehyde emissions from hardwood plywood, particleboard, and medium-density fiberboard and finished products made with composite wood products. Cal. Code Regs. tit. 17, §§ 93120 - 93120.12 (2009). Advocates such as Plaintiffs and others urged the EPA to adopt the CARB standards on a national basis under the Toxic Substance Control Act. (See, e.g., Fields Decl., Ex. 3.) The EPA declined to adopt the California standards, indicating that it did not have sufficient information to make the necessary findings under the TSCA to regulate exposure to the chemical. The EPA indicated that the California standards could not be adopted nationally under the regulatory authority granted to the EPA by the TSCA, without "independently determining that formaldehyde in the relevant materials presents or will present an 'unreasonable risk' under [the TSCA]." 73 Fed. Reg. 36,507 (June 27, 2008).
In 2010, after subsequent study and oversight of FEMA's response to illnesses reported by hurricane victims, Congress passed the bipartisan Formaldehyde Act incorporated into the TSCA to address the high levels of formaldehyde emissions from household wood products. The Formaldehyde Act sought to codify the California standards and to establish national emission standards for acceptable levels of formaldehyde in domestic and imported composite wood products. See S. Rep. No. 111-169, at 1 (2010); see also H.R. Rep. 111-509, pt. 1, at 7-8 (2010). In the passage of the Act, the House found that "[f]ormaldehyde is a chemical known to have adverse effects on human health. It has been recognized by the International Agency for Research on Cancer as a known carcinogen and by the Environmental Protection Agency as both an irritant and a probable human carcinogen.... In addition, inhalation of formaldehyde can cause nose and throat irritation, difficulty breathing, burning sensations in the eyes and throat, and nausea. Other effects include coughing, wheezing, chest pain, bronchitis, and severe allergic reactions." H.R. Rep. 111-509, pt. 1, at 7-8 (2010). "Despite its known harmful effects, formaldehyde is widely *1055 used in a variety of applications. The primary sources of formaldehyde in the air inside homes are composite wood products, also known as pressed wood products ... [which] are made with adhesives that contain formaldehyde, which can be released into the home." Id. at 8.
In the same report, the House indicated that the bill would establish "national technology-based limits (i.e., limits based on the technological feasibility of the standards) on formaldehyde emissions from most composite wood products ... [by] requiring EPA to issue regulations, not later than January 2, 2013, to apply formaldehyde emissions standards that are equivalent to the California standards." Id. at 8-9. "Under the bill, the new limits will go into effect 180 days after EPA issues its regulations." Id. at 9. The Act specifically directed the EPA to ensure that, within 180 days after promulgation of its regulations, the new emission standards "shall apply to hardwood plywood, medium-density fiberboard, and particleboard sold, supplied, offered for sale, or manufactured in the United States." 15 U.S.C. § 2697(b)(1) (emphasis added).
The requirement of an expeditious compliance date set at 180 days after promulgation of the agency's implementing regulations was a compromise made by Congress to balance both the severe health concerns caused by formaldehyde in wood composite products against the time it would take industry and the agency to adapt to and structure enforcement of the new emission standards. See H.R. Rep. No. 111-169, at 7 (2010) (as originally introduced, the statute would have become effective within 180 days of enactment, but it was amended to provide that the emission standards would become effective 180 days after the date of promulgation of the EPA's regulations, finding that the "change in the effective date will allow sufficient time for industry to comply with the requirements and sufficient flexibility for EPA to promulgate and implement the regulations."). In the passage of the Act, Congress specifically set the tight deadline for compliance with stricter emission standards after regulations were promulgated as an effort both to address the significant adverse health effects of formaldehyde in household wood products and to eliminate the competitive advantage that foreign suppliers who had not been subject to the California standards had in the marketplace. H.R. Rep. No. 111-509, pt. 1, at 7-9 (2010), 14-15; 156 Cong. Rec. H4704 (daily ed. June 23, 2010) (statement of Rep. Matsui).
The sole relevant exception to this mandatory 180-day effective date for enforcement of the stricter emission standards is incorporated in the section of the Act entitled "sell-through provisions." That section addresses the phase-in of the emission standards by establishing, with reference to the date of manufacture, the date at which the stricter standards would apply to the sell-through, or preexisting, inventory of composite wood products. As was made clear in the legislative history, the "bill before the House today provides greater clarity regarding the actual emission standards that the EPA must promulgate and mandates 'sell-through' provisions that ensure fair treatment for merchants seeking to sell inventory manufactured before the emission standards take effect." 156 Cong. Rec. H4704 (daily ed. June 23, 2010) (statement of Rep. Radanovich) (emphasis added).
The Act provides an exception for the use and sale of existing inventories through the sell-though provision, which states:
Sell-through provisions established by the Administrator under this subsection, *1056 with respect to composite wood products and finished goods containing regulated composite wood products ..., shall-
(i) be based on a designated date of manufacture (which shall be no earlier than the date 180 days following the promulgation of the regulations pursuant to this subsection ) of the composite wood product or finished good, rather than the date of sale of the composite wood product or finished good; and
(ii) provide that any inventory of composite wood products or finished goods containing regulated composite wood products, manufactured before the designated date of manufacture of the composite wood products or finished goods, shall not be subject to the formaldehyde emission standard requirements under subsection (b)(1).
15 U.S.C. § 2697(d)(3)(A) (emphasis added).
The sell-through provision allows the EPA to designate the date of manufacture instead of the date of sale to address the treatment of noncompliant inventory. In passing the Formaldehyde Act, patterned after the California standards, Congress recognized that there must be a phase-in time to allow the sale or use of supplies of composite wood products and finished wood goods already in the pipeline that would not comply with the stricter standards. The CARB rule provided that the transitional phasing out of existing inventory would be designated based on dates of sale. See Cal. Code Regs. tit. 17, § 93120.12(a)-(e) & app. 1 (2009). However, following the housing crisis in 2008, noncompliant inventories had not been sold at the rate expected. Accordingly, CARB was compelled to extend the sell-by date multiple times. In contrast, Congress adopted in its sell-through provision the designation of the manufacture date instead of the sale date.
The Act also provides that stockpiling of inventoried goods and products is forbidden. Stockpiling is defined as the manufacture or purchase of noncompliant wood products between the enactment of the Formaldehyde Act (July 7, 2010) and 180 days after promulgation of the implementing regulations. See 15 U.S.C. § 2697(d)(3)(C). The Act requires that the EPA's regulations "prohibit the stockpiling of inventory to be sold after the designated date of manufacture." 15 U.S.C. § 2697(d)(3)(B)(i).
In June 2013, the EPA set out two proposed rules: one proposed new formaldehyde emission standards and implementing regulations and the other proposed a framework for a third-party certification program. 78 Fed. Regs. 34810 and 34796 (proposed June 10, 2013). The first of these rules, which was finally published in the Federal Register in December 2016, established emission standards for formaldehyde in composite wood products and associated testing and compliance mechanisms. 81 Fed. Reg. 89,674 (Dec. 12, 2016) (the "Formaldehyde Rule"). The rule established a manufactured-by date of December 12, 2017 for sell-through composite wood products. Id. at 89,675.
On January 20, 2017, inauguration day, the President directed executive agencies to freeze regulations that had been published in the Federal Register but had not yet gone into effect. In an effort to follow this directive, the EPA issued an omnibus final rule delaying the effective dates of 30 listed regulations, including the Formaldehyde Rule, until March 21, 2017. 82 Fed. Reg. 8499 (Jan. 26, 2017). On March 20, 2017, the EPA published a subsequent final rule delaying the effective dates of several regulations, including the Formaldehyde Rule, for another 60 days, until May 22, 2017. 82 Fed. Reg. 14,324 (Mar. 20, 2017). As of May 22, 2017, when the *1057 Formaldehyde Rule was formally in effect, the EPA published a direct final rule and proposed rule to extend the Formaldehyde Rule's compliance deadlines for another three months. 82 Fed. Reg. 23,735 (May 24, 2017). However, after the EPA received negative comments on the proposed rule change, it withdrew the direct final rule. 82 Fed. Reg. 31,267 (July 6, 2017).
After receiving comments on the proposed rule to extend the compliance deadlines, on September 25, 2017, the EPA published a new final rule which extended some compliance deadlines by the original three months. In addition, the new rule re-designated the manufacturing date established by the Formaldehyde Rule to one year later than it had previously. Based on this extension of deadlines, the EPA set both the manufacturing and emission standards compliance dates to December 12, 2018, more than three years after the Formaldehyde Act had originally directed the EPA to require compliance. 82 Fed. Reg. 44,533 (Sept. 25, 2017) (the "Delay Rule").
By publication of the Delay Rule, the EPA set the date of manufacture out an additional year to December 2018 and concurrently extended the emission standards compliance deadline. Accordingly, the current deadline for domestic industry to comply with the emission standards far exceeds the mandatory 180-day deadline after promulgation of the Formaldehyde Rule and years after the Congressional deadline. Plaintiffs contend the Delay Rule is unlawful because it exceeds the EPA's statutory authority under the Formaldehyde Act to ensure compliance with new emission standards expeditiously. Accordingly, by filing this suit, Plaintiffs seek an order declaring the Delay Rule contrary to and in excess of the EPA's authority under the Formaldehyde Act, and request that this Court issue an order vacating and setting aside the year-long extension of the compliance deadlines set out by the EPA's Delay Rule.
B. Judicial Review of the EPA's Delay Rule.
This Court's review of the EPA's actions is governed by the Administrative Procedure Act, 5 U.S.C. section 706 ("APA"). See 16 U.S.C. § 839f(e)(2) (incorporating scope of review provisions of the APA). Under the APA, the EPA's decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a) ; see also Portland Gen. Elec. Co. v. Bonneville Power Admin. , 501 F.3d 1009, 1025 (9th Cir. 2007). Here, the Court is tasked with review of the EPA's construction of the Formaldehyde Act. The EPA contends the Act gives the agency the authority to extend not only the manufacture date for the purposes of the exception of the sell-through provisions, but also grants it the authority to extend the emission standards compliance deadline to a date more than the 180 days past promulgation of the regulations as designated by Congress.
The Court must first review the construction of the Formaldehyde Act giving the EPA discretion to operate: "[o]ur first question is always 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "On the other hand, where Congress expressly or implicitly confers authority to fill in a gap in the enacted law or resolve a statutory ambiguity, we accord the agency's ensuing decision considerable deference." Id. (citing *1058 United States v. Mead Corp., 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ). Where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778. At the same time, "[r]egardless of how serious the problem an administrative agency seeks to address, ... it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.' " FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988) ). "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." Id. at 161, 120 S.Ct. 1291. The agency's "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." City of Arlington, Texas v. FCC , 569 U.S. 290, 297-98, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013). No matter how the question is framed, courts, when confronted with an agency's interpretation of a statute it administers, must answer "whether the agency has stayed within the bounds of its statutory authority ." Id. at 297, 133 S.Ct. 1863 (emphasis in original). Although any reasonable agency interpretation of the statute should be given deference and should not be substituted by the court's own view, the agency's interpretation of the statute must yield to clear congressional intent.
Accordingly, the Court must begin by identifying the precise scope of the statutory authority Congress has granted to the EPA by virtue of passing the Formaldehyde Act. The Act explicitly provides that the emission standards shall be made effective no later than 180 days after promulgation of the agency's regulations enforcing the Act. In the section setting out the background and need for legislation, the House specifically indicated that "[u]nder the bill, the new limits will go into effect 180 days after EPA issues its regulations." H.R. Rep. 111-509, pt. 1, at 9 (2010). The language of the bill itself states that "[e]xcept as provided in an applicable sell-through regulation promulgated pursuant to subsection (d), effective beginning on the date that is 180 days after the date of promulgation of those regulations, the emission standards ... shall apply to hardwood plywood, medium-density fiberboard, and particleboard sold supplied, offered for sale, or manufactured in the United States." 15 U.S.C. § 2697(b)(1) (emphasis added).
It is clear from the legislative history of the statute that Congress was foremost concerned with the expeditious implementation of emission standards designed to protect both the health of vulnerable populations affected by the use of composite wood products as well as domestic manufacturers who were, in large part, compelled to abide by California emissions levels and not able to compete fairly with imported goods that had not been subject to the same manufacturing standards. However, it is clear that Congress also was aware of the need to provide sufficient time for industry to comply with the new standards as well as to address the status of goods that were already in the pipeline at the time the stricter standards would take effect. The expeditious deadline set by Congress in the body of the Act addressed these dueling goals and incorporated flexibility for the EPA to promulgate and implement regulations aimed at enabling industry time to comply with stricter standards as well as to sell off or use existing inventory.
*1059 The relevant exception provided in the Act to the short time frame for implementation of the emission standards is the sell-through provision. This provision allows the EPA to designate the date of implementation for industry participants who retain preexisting inventory of composite wood products and finished goods containing regulated products and allows the EPA to designate the inventory sell-through requirements with reference to the date the products were manufactured. The provision states that the date of manufacture "shall be no earlier than the date 180 days following the promulgation of the regulations pursuant to this subsection." 15 U.S.C. § 2697(d)(3)(A)(i).
The sell-through provision clearly applies to existing inventories and cannot change the effective date set by Congress for mandatory compliance with emission standards governing new production. The parenthetical in the sell-through exception permits the EPA to set the date of manufacture as the designation to determine the universe of inventory of noncompliant wood products to be sold and used until the inventories ran out. In order to give meaning to the provisions of the Formaldehyde Act which require timely compliance with the new emission standards and prohibit stockpiling, the universe of eligible inventories must not continue to accrue after the 180 days following promulgation of the Formaldehyde Rule. Accordingly, the Court finds that the designation of a manufacturing date "no earlier than 180 days following promulgation of the regulations" found in the sell-through provision of the Formaldehyde Act must fall on the 180th day after the regulations take effect. The EPA's interpretation to set the manufacture date beyond 180 days from promulgation of their regulations and thereby resetting the compliance date accordingly violates the Act's mandatory expedient compliance deadline and the prohibition against stockpiling.
Although the Court owes deference to the EPA's interpretation of the statute, the Court is compelled to give meaning to the statutory provisions and cannot endorse an interpretation that permits the EPA to exercise its authority " 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.' " Brown & Williamson Tobacco, 529 U.S. at 125, 120 S.Ct. 1291 (quoting ETSI Pipeline Project, 484 U.S. at 517, 108 S.Ct. 805 ). "[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." Id. at 161, 120 S.Ct. 1291. Here, the interpretation advanced by the EPA-that the agency can designate the manufacture date beyond the 180 days limit for compliance with the emission standards-is contrary to law and beyond the valid grant of authority bestowed upon the agency by Congress in the Formaldehyde Act.
In addition, beyond the limited grant of authority and the clear intention of Congress to set an expedited schedule to enforce compliance deadlines and forbid stockpiling, the Court finds support for its statutory analysis in the basic tenets of statutory construction. The reviewing court must examine the relevant statutory provisions at issue and they "should be construed consistently." Exxon Mobil Corp. v. EPA , 217 F.3d 1246, 1250 (9th Cir. 2000) (citing Department of Revenue of Oregon v. ACF Industries, Inc. , 510 U.S. 332, 340-41, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) ). "Statutory constructions which render other provisions superfluous are disfavored." Id. (citing Hohn v. United States , 524 U.S. 236, 249, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) ). "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words *1060 are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act." United States v. Am. Trucking Ass'ns , 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The clear purpose of the Act and the plain meaning of its core provisions was to set expeditious emission compliance standards (not to exceed 180 days past the promulgation of implementing regulations) and to allow the sell off or use of preexisting noncompliant inventory but to prohibit stockpiling. This clear purpose and plain meaning cannot be reconciled with the EPA's suggestion that a year-long extension of the designated date of manufacture in the sell-through provisions permissibly leads to a commensurate year-long extension of the mandatory compliance deadlines. The EPA's interpretation creates inconsistency within the full text of the Act, renders the 180-day compliance deadline superfluous, leads to the absurd result of permitting the perpetual delay of the effectiveness of the Formaldehyde Rule, and fails to satisfy the stated purpose of the Act. Accordingly, the Court finds that the Delay Rule is in excess of the EPA's authority under the Formaldehyde Act and is not in accordance with law. See 5 U.S.C. § 706(2)(A).
C. Waiver Issue.
The EPA contends that this Court should not consider Plaintiffs' allegations in this suit because the issues were not raised before the agency during the rule making procedure. "As a general rule, we will not review challenges to agency action raised for the first time on appeal." Portland General Elec. , 501 F.3d at 1023 (citing Exxon Mobil , 217 F.3d at 1249 ). A party petitioning the court for redress of grievances may waive "their right to judicial review ... [when] they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review." Id. This rule does not foreclose judicial review, but rather is construed as a waiver that may foreclose consideration of specific arguments. Id. at 1023-24. In general, a court "will not invoke the waiver rule in [its] review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue." Id. at 1024 (citing Natural Resource Defense Council, Inc. v. EPA , 824 F.2d 1146, 1150-51 (D.C. Cir. 1987) (en banc) ). "This is true even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." Id. (citing Portland General Electric Co. v. Johnson , 754 F.2d 1475, 1481 (9th Cir. 1985) ). The waiver rule serves to protect the agency's "prerogative to apply its expertise, to correct its own errors, and to create a record for our review." Id. (citing Cal. Energy Res. Conservation & Dev. Comm'n v. BPA , 831 F.2d 1467, 1475 (9th Cir. 1987) ). In addition, unlike a statute that requires administrative exhaustion which would create a jurisdictional issue on appeal, the court may "excuse waiver in exceptional circumstances." Id. (citations omitted).
Here, Plaintiffs did not challenge the EPA's authority to extend the compliance deadline in the Delay Rule during the rule-making proceedings before the agency. However, the Court finds the record replete with comments from other stakeholders who objected to the further extension of the compliance deadlines. The Composite Panel Association ("CPA"), which filed an amicus brief before this Court, supported only a three-month extension to the compliance deadlines in the rule-making process and objected to any further delay. (See Opp. Br., Ex. H.) The CPA submitted further correspondence to the *1061 EPA prior to publication of the Delay Rule indicating the need for prompt implementation of the regulations. (See id. , Ex. P at 5.) The CPA indicated that although it recognized "the complexity of this undertaking by EPA staff, further delay after seven years of development is unwarranted. This regulation has taken almost twice as long to produce as the United States' involvement in World War II. It is time to proceed." (Id. ) CPA expressed its position that the regulated community had enjoyed "more than ample time to prepare for the requirements of the Regulation" and that further delay was "unwarranted." (Id. ) The EPA also received numerous anonymous comments opposing any further extension of the deadlines and indicating there should be a limit to the number of deadline extensions given. (See id. , Exs. I, E.) On the basis of this record, the Court concludes that the issue of whether the EPA should extend the deadline for compliance with the emission standards of the Formaldehyde Rule was adequately before the agency for consideration.
In addition, the waiver rule does not apply to preclude argument where the scope of the agency's power to act is concerned. The purpose of the waiver protection is to ensure that the agency is given the first opportunity to bring its expertise to bear on the resolution of any challenge to its proposed rule. But "even if a party may be deemed not to have raised a particular argument before the agency, EPA retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule and therefore ... EPA must justify that assumption even if no one objects to it during the comment period." Natural Resources Defense Council v. EPA , 755 F.3d 1010, 1022-23 (D.C. Cir. 2014) (internal citations omitted). Here, the Court finds that the EPA was presented with sufficient challenges to its continued delay of compliance dates in the Formaldehyde Rule. Regardless, the Court also finds the EPA is separately tasked with the obligation to examine its own authority and not to promulgate implementing regulations in a way that exceeds its scope. Accordingly, the Court rejects the EPA's waiver argument.
CONCLUSION
The Court finds the Delay Rule is beyond the scope of the EPA's authority and is not in accordance with the Formaldehyde Act. The Court GRANTS Plaintiff's motion for summary judgment and DENIES the EPA's cross-motion for summary judgment. Having found that the EPA has acted in excess of its statutory authority and therefore unlawfully under the APA, the Court vacates and sets aside the year-long extension to December 12, 2018 of the compliance deadlines set out by the EPA in the Delay Rule. See 5 U.S.C. § 706(2)(A) ; see also California Communities Against Toxics v. EPA , 688 F.3d 989, 992 (9th Cir. 2012) (per curiam).
At oral argument on these motions, the parties agreed that should the Court vacate the Delay Rule, the parties would meet and confer to address the timely implementation of the Court's order. Accordingly, the Court STAYS this order vacating the Delay Rule until such time as the parties can address the timely and effective implementation of the compliance guidelines. The parties shall have until March 9, 2018 at 4:00 p.m. to provide the Court with a joint proposed submission or simultaneous briefing each not to exceed 15 pages to address the timing for lifting the stay and expeditious implementation of the Court's order.
IT IS SO ORDERED.